IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHALEE BALIUS-DONOVAN,

      Plaintiff,

    v.

BEHNAMIRI AND ASSOCIATES,
LLC, *doing business as* The Place;
MAHMOUD BEHNAMIRI;
HASSAN NEGAHDAR;
BEHNAMIRI AND NEGAHDAR,
LLC, *doing business as* The Place Bar
and Grill; and B&N PARTNERS,
LLC, *doing business as* The Place
Tavern,

      Defendants,

and

MAHMOUD BEHNAMIRI,

      Counter Claimant,

    v.

SHALEE BALIUS-DONOVAN,

      Counter Defendant.

CIVIL ACTION FILE NO.

1:19-cv-02703-CAP-CMS

## **FINAL REPORT AND RECOMMENDATION**

This case is before the Court on the following motions:

(1)     Plaintiff's   Motion   for   Partial   Summary   Judgment [Doc. 127];

(2)     Individual Defendant Behnamiri's Motion for Summary Judgment and, in the Alternative, Motion for Partial Summary Judgment [Doc. 130];

(3)     Individual Defendant Negahdar's Motion for Summary Judgment [Doc. 140]; and

(4)     the Motion for Summary Judgment filed by corporate defendants Behnamiri and Associates, LLC; Behnamiri and Negahdar, LLC, and B&N Partners, LLC [Doc. 143].

## I.     **PROCEDURAL BACKGROUND AND PRELIMINARY ISSUES**

On June 13, 2019, Plaintiff Shalee Balius-Donovan ("Plaintiff") filed this lawsuit initially against her employer, Behnamiri and Associates, LLC d/b/a The Place, a bar and grill in Marietta, Georgia, and its owners, Mahmoud ("Mo") Behnamiri and Hassan Negahdar.  [Doc. 1, Complaint].  Plaintiff's Complaint alleged claims for sexual harassment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and state law claims for sexual battery, negligent supervision and retention, fraud, equitable estoppel, and punitive damages.  [*Id.*].

2

In response, each defendant filed an answer.  Mr. Behnamiri, who is represented by separate counsel, also asserted counterclaims against Plaintiff for defamation, intentional infliction of emotional distress, and abusive litigation.  [Doc. 11].

On November 4, 2019, Plaintiff filed an Amended Complaint, adding two related corporate entities as defendants and a retaliation claim against Mr. Behnamiri based on the counterclaims that he filed against her.  [Doc. 38, Am. Compl.].  Plaintiff's Amended Complaint asserts the following seven counts for relief:  Count One, Sexual Harassment, under Title VII; Count Two, Retaliation, under Title VII; Count Three, Battery; Count Four, Negligent Supervision and Retention; Count Five, Fraud; Count Six, Equitable Estoppel; and Count Seven, Punitive Damages.  [*Id.*].  Each of the counts for relief asserted in Plaintiff's Amended Complaint incorporates by reference all of the factual allegations asserted in the complaint, and none of the counts specifically indicate which defendant or defendants she is asserting her claim against.  This creates the difficulty the Eleventh Circuit has repeatedly warned against when presented with such a prohibited "shotgun" format complaint—i.e., the Amended Complaint fails to give the defendants (or the Court) adequate notice of the claims against the defendants and the grounds upon which each claim rests.  *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–22 (11th Cir. 2015) (citing as an

AO 72A
(Rev.8/8
2)

example a complaint that asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.").

Generally, the appropriate response to a shotgun complaint is to dismiss it and allow the plaintiff an opportunity to amend to provide greater specificity. *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). However, in this case, Plaintiff has already filed an amended complaint, without correcting the problem. The defendants have had ample opportunity to raise this issue (but have not), and they have filed motions for summary judgment again without raising the issue. Because the Defendants appear to have been able to sort out Plaintiff's factual allegations, and Plaintiff has not challenged their interpretation(s) of her claims, the Court has considered the Amended Complaint's merits rather than dismiss it and require Plaintiff to re-plead.

There are also two other significant issues that must be resolved prior to trial (if this case proceeds to trial). First, in a Title VII case, a plaintiff may only proceed against her "employer." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (per curiam). Title VII makes it unlawful for "an employer . . . to discriminate against any [employee] with respect to . . . sex," 42 U.S.C. § 2000e–2(a)(1), and defines

4

"employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees," § 2000e(b).  Thus, there is a threshold employee-numerosity requirement of fifteen or more employees that a plaintiff must allege and establish as an element of her claim.  *See Arbaugh v. Y & H Corp*., 546 U.S. 500, 515 (2006).  Plaintiff's Amended Complaint contains no such allegation(s).  Moreover, there is uncontroverted deposition testimony that each restaurant (which are owned by separate corporate entities) had only 10–12 employees during the relevant time period.  [Doc. 141-3, Deposition of Hassan Negahdar Khorshidsard ("Negahdar Dep."), at 19–20].

Plaintiff appears to be trying to circumvent that problem by alleging that the three corporate defendants have common ownership structures, and together they "manage" three bars and grills doing business as "The Place."  [Am. Compl. ¶¶ 4, 5].  Plaintiff alleges that for purposes of Title VII, the three corporate defendants (collectively, "Corporate Defendants") are a single or joint employer, with integrated operations, common ownership, management, administrative functions, trade name, and employees.  [Am. Compl. ¶¶ 13–14].  Plaintiff further alleges that during her employment with "Defendants," she worked at each of the three restaurants "at various times."  [*Id.* ¶ 15].  This allegation, however, is extremely vague for purposes of determining who Plaintiff's employer was during the relevant time period.  [*Id.*]. This

5

ambiguity is compounded by Plaintiff's failure to offer any explanation for why the EEOC Charge that she filed names as her employer only Behnamiri & Associates, LLC/The Place and Mahmoud Behnamiri. [Doc. 140-2 at 2]. Her motion for summary judgment also states that her employer was "Behnamiri and Associates, LLC." [Doc. 127-1 at 2]. Behnamiri & Associates, LLC is the corporate entity that owns The Place (the Sandy Plains location). Plaintiff has submitted no paychecks or pay stubs or any evidence showing which entity or entities, if any, issued and paid her for the work that she performed for any or all of the Corporate Defendants.

In their answers to Plaintiff's Amended Complaint, each of the defendants denied Plaintiff's "single or joint employer" allegations as well as her allegation that she worked at each of the three restaurants. [*See* Docs. 50, 51, 58, 60, 106, ¶¶ 13–15]. Plaintiff has submitted no evidence that she ever worked at The Place Tavern (the Hiram location owned by B&N Partners, LLC). In their motions for summary judgment, however, none of the defendants seem to be contesting Plaintiff's "single or joint employer" allegations or the Corporate Defendants' alleged status as "a single or joint employer." Accordingly, for purposes of this Report and Recommendation, I will assume—but not formally find—that the three Corporate Defendants acted as Plaintiff's joint employer for Title VII purposes. But in the event this case goes to

trial, Plaintiff must be prepared to prove which entity (or entities) she was employed by and that there were the requisite number of employees.  *See* 42 U.S.C. § 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.").

Second, Plaintiff appears to be trying to assert her Title VII claims against Mr. Behnamiri individually.  As noted above, a Title VII claim may be brought only against an "employer." 42 U.S.C. §§ 2000e–2(a), 2000e–3(a).  There is no individual liability under Title VII.  *See Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) (per curiam).   Nevertheless, the allegations in Count I (sexual harassment) of Plaintiff's Amended Complaint refer to actions only by "[t]he owner, Defendant Behnamiri," and in Count II (retaliation under Title VII), Plaintiff alleges that Mr. Behnamiri retaliated against Plaintiff by filing what she contends are frivolous counterclaims in response to the filing of her original Complaint.  [Am. Compl. ¶¶ 35–38, 44].  Because there is no individual liability under Title VII, Plaintiff's Title VII claims against Mr. Behnamiri individually fail, and are due to be dismissed. *See Chandler v. Pye Automotive Group, LLC*, No. 4:17-cv-00086-HLM-WEJ, 2018 WL 3954768, at *8 (N.D. Ga. July 9, 2018).

7

To the extent Plaintiff is asserting that the Court should consider Mr. Behnamiri to be her employer because he was the majority owner of the restaurants, with "plenary authority over the workplace," and operational control of the business, the Eleventh Circuit Court of Appeals rejected a similar contention in *Dearth*. *See Dearth v. Collins*, 441 F.3d at 933. In *Dearth*, an employee claimed that she was sexually harassed by her supervisor, who was also the president, director and sole shareholder of the company. *Id.* at 932. The employee plaintiff sought to recover under Title VII against the supervisor in his individual capacity, and the Eleventh Circuit rejected the claim because "relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act." *Id.* at 933. This case is indistinguishable from *Dearth*, and the Court therefore cannot find that Mr. Behnamiri was Plaintiff's "employer" within the meaning of Title VII. Accordingly, Plaintiff's Title VII claims against Mr. Behnamiri fail, and Mr. Behnamiri is entitled to dismissal of those claims. I will discuss this issue in greater detail when I address Mr. Behnamiri's motion for summary judgment.

As noted earlier, following the close of the discovery period, all parties to this case filed a motion for summary judgment or motion for partial summary judgment. Oral argument on the pending motions was held on July 6, 2021 via Zoom. The

AO 72A
(Rev.8/8
2)

motions have been briefed and, with the benefit of oral argument, are before me for consideration and a Report and Recommendation.

## II.   **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56; *Ezell v. Wynn*, 802 F.3d 1217, 1222 (11th Cir. 2015). The moving party bears the initial burden of showing the court "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact" and "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (en banc). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party fails to discharge this initial burden, the motion must be denied. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

If the burden is met, however, the non-moving party must then "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for

9

trial.'" *Celotex Corp.*, 477 U.S. at 324 (citation omitted).  "A 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (citation omitted).   Mere conclusions and factual allegations unsupported by evidence are insufficient to survive a motion for summary judgment. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted).

The applicable summary judgment standard is not affected by the filing of cross-motions for summary judgment. *See United States v. Oakley*, 744 F.2d 1553, 1555-56 (11th Cir. 1984).  "[T]he filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist." *Floyd v. SunTrust Banks, Inc.*, 878 F. Supp. 2d 1316, 1321 (N.D. Ga. 2012).  Rather, when parties file cross-motions for summary judgment, "each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law." *See Busby v. JRHBW Realty, Inc.*, 642 F. Supp. 2d 1283, 1288 (N.D. Ala. 2009).  The court must consider each motion independently, and in accordance with the

10

Rule 56 standard. *See Floyd*, 878 F. Supp. 2d at 1321 (citation omitted); *see also Teal v. Gibbs*, No. 4:10-CV-840-VEH, 2011 WL 13229629, at *2 (N.D. Ala. June 28, 2011) ("Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.") (citations omitted).

It is not the Court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the Court relies on the non-moving party to identify the evidence which creates an issue of triable fact. *See* FED. R. CIV. P. 56(c)(1)-(3); *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990). Resolving all doubts in favor of the non-moving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). All reasonable inferences will be made in the non-moving party's favor. *Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).

## III.  <u>FACTS</u>

In light of the foregoing summary judgment standard, the Court finds the following facts for the purpose of resolving the parties' pending motions for summary judgment or partial summary judgment only.

AO 72A
(Rev.8/8
2)

Corporate defendant Behnamiri & Associates, LLC owns The Place located at 700 Sandy Plains Road, Suite A-1, Marietta, Georgia, 30066 ("Sandy Plains"). Mr. Behnamiri is majority owner with an 80% ownership interest, and Mr. Negahdar is general manager of the location, with a 20% ownership interest.  [Doc. 142, Negahdar's Statement of Material Facts ("NSMF"), ¶¶ 1, 5].

Corporate defendant Behnamiri and Negahdar, LLC owns a second location, The Place Bar and Grill, located at 1105 Parkside Lane, Suite 1102, Woodstock, Georgia, 30189 ("Towne Lake"), with the same ownership structure: Mr. Behnamiri owns 80% and Mr. Negahdar is minority owner with a 20% ownership interest. [NSMF ¶ 2; Doc. 140-4].

Corporate defendant B&N Partners, LLC owns the third and final location, The Place Tavern, which is located at 5886 Wendy Bagwell Parkway, Hiram, Georgia, 30141 ("Hiram"), wherein Mr. Behnamiri and Mr. Negahdar each hold a 50% ownership interest.  [NSMF ¶ 3; Doc. 140-6].  Plaintiff testified that none of alleged incidents of sexual harassment or unwelcome conduct took place at the Hiram location. Doc. 141-1, Deposition of Shalee Balius-Donovan ("Pl.'s Dep.") at 232].

It is undisputed that at all relevant times, Mr. Behnamiri had no day-to-day involvement in managing the three restaurants, he was not employed by any of the

AO 72A
(Rev.8/8
2)

corporate entities, and he did not receive a salary from any of the locations.  [NSMF ¶4; Doc. 141-2, Deposition of Mahmoud Behnamiri ("Behnamiri Dep.") at 20–21, 29–30; Doc. 140-3, Negahdar Decl., ¶ 3; Pl.'s Dep. at 198 ("I knew he wasn't operationally involved in The Place . . . he and Hassan were friends, and he helped him buy the bar.")].[1]  Mr. Behnamiri's involvement mostly centered around the money it took to operate the restaurants.  [Behnamiri Dep. at 21–22; Pl.'s Dep. at 229–30].  He has not made any profit from the restaurants for the past six or seven years. [Behnamiri Dep. at 32].  Mr. Behnamiri testified that he has known Hassan Negahdar for many years, and they have "more of a business relationship" than a social relationship; they do not socialize with each other or together with their families.  [*Id.* at 39].  Since 1990, Mr. Behnamiri has been employed by, and is majority owner of, Southeast Restoration and Fireproofing.  [*Id.* at 11, 13].  He also has numerous other business interests in addition to the three restaurants at issue in this lawsuit.  [*Id.* at 15–16].

During all relevant times, Mr. Negahdar was employed as the general manager of the three restaurants and received a salary for his role.  [NSMF ¶ 5; Negahdar Dep.

---

[1]  Unless otherwise indicated, citations to the record are made to the CM/ECF heading at the top of the page cited; citations to deposition pages are to the actual page number of the hardcopy deposition transcript.

AO 72A
(Rev.8/8
2)

at 20, 31; Pl.'s Dep. at 229].  Unless Mr. Negahdar was closing one of the restaurants or acting as the primary manager on duty that day, he mostly "popped in and out" of the different locations, and did not generally stay for a prolonged period in either the Sandy Plains or Towne Lake locations.  [NSMF ¶ 10; Pl.'s Dep. at 230, 191–92; Negahdar Dep. at 37].  Once the Hiram location opened around 2015, he mostly worked at that location.  [Negahdar Dep. at 37].  Mr. Negahdar testified that during all relevant times, there were approximately 10 to 12 employees at each location, except there were fewer during the COVID-19 pandemic.  [*Id.* at 19–20].

Plaintiff began her employment at the Sandy Plains location in 2002, and worked there for the next sixteen years as a bartender and/or bar manager.  Plaintiff knew Mr. Negahdar from having worked with him before at a different restaurant, and considered him to be friend.  [Pl.'s Dep. at 7].  If there was any kind of problem at the restaurant, she "pretty much took everything to Hassan."  [*Id.* at 7, 225].  Once the Towne Lake location opened in 2007 or 2008, Plaintiff would occasionally work there. [*Id.* at 14; Behnamiri Dep. at 19].  Plaintiff testified that at the beginning of her employment at the Sandy Plains location, "it was a very friendly relationship where I had already [sic] knew both [Mr. Behnamiri and Mr. Negahdar], and I was friends with both of them."  [Pl.'s Dep. at 9–10].  Within the first six months of her

14

employment, Plaintiff noticed that Mr. Behnamiri seemed to be "getting a little more interested" in her, but it was not "alarming" to Plaintiff at that time. [*Id.* at 10–12]. They had an "established friendship on top of a working relationship." [*Id.* at 11]. Mr. Behnamiri would greet Plaintiff with a hug and kiss on the cheek when he visited his restaurant as he did with a few others; Plaintiff assumed this type of greeting was common in Mr. Behnamiri's Iranian culture, not that he was acting inappropriately. Although Plaintiff testified that Mr. Behnamiri's conduct made her feel uncomfortable, she did not consider it to be sexual harassment at that time. [Pl.'s Dep. at 12–13; Doc. 155-1, Declaration of Shalee Balius-Donovan ("Pl.'s Decl."), ¶ 3]. At her deposition, Plaintiff testified that Mr. Behnamiri would come in and ask about her family, ask about her children, and how she was doing, and that he was "just very friendly[,] trying to get to know [her], just interested in [her] personal life." [Pl.'s Dep. at 11].

In or around 2007, shortly after Plaintiff had gone through a divorce, Plaintiff told Mr. Behnamiri that she was living in an apartment and was uncomfortable with her young son walking home alone from the bus stop after school. [Pl.'s Dep. at 27–28]. Mr. Behnamiri offered to assist her in purchasing a residence in Canton, Georgia that she and her three young children could live in. [Behnamiri Dep. at 41; NSMF ¶ 27; Doc. 119-2 at 10, 23–24]. Mr. Behnamiri had also helped Mr. Negahdar

15

purchase a home by lending him $90,000 for the downpayment, which Mr. Negahdar later paid back.  [Behnamiri Dep. at 43–44; Negahdar Dep. at 48].

Plaintiff's original plan was to obtain the loan herself and for Mr. Behnamiri to merely cosign on the loan because Plaintiff did not make enough money to qualify for the loan on her own.  Ultimately, however, after Plaintiff discussed various options with Mr. Behnamiri and the mortgage broker, Vicki Vickery, the decision was made that only Mr. Behnamiri would have his name on the loan and security deed, he would buy the property as an investment, and Plaintiff would be responsible for reimbursing Mr. Behnamiri for the monthly mortgage payments.  [Pl.'s Dep. at 148–49].  During the financing process, Ms. Vickery warned Plaintiff that without a quitclaim deed or some other indicia of ownership, Plaintiff would not be protected and would have no rights.  [Doc. 123-1, Deposition of Vicki Vickery ("Vickery Dep."), at 13, 17, 20, 22]. Nevertheless, Plaintiff agreed that Mr. Behnamiri would purchase the house alone. Plaintiff testified that Mr. Behnamiri's "rates were far, far better than mine.  So I was—it was just a much more beautiful deal, . . . a better deal than what I could do on my own.  Yes, it was better, and it would save me a lot of money."  [Pl.'s Dep. at 148–49; Doc. 146, Def. Behnamiri's Stmt. of Mat. Facts ("BSMF"), ¶¶ 20–29]. Plaintiff and Mr. Behnamiri agreed that when the loan was paid off, the house would

16

be hers.  [Pl.'s Dep. at 152; Behnamiri Dep. at 46–47].  The house was not a gift, however; Plaintiff was expected to pay (and agreed to pay) Mr. Behnamiri the mortgage payment every month for the life of the loan, even if it took twenty or thirty years.  [Pl.'s Dep. at 151–52; Behnamiri Dep. at 61–62; BSMF ¶¶ 27–29].  Plaintiff's understanding was that before the loan was paid in full, the house belonged to the bank.  [Pl.'s Dep. at 152].  According to Mr. Behnamiri, Plaintiff was sent a rental agreement, but she never signed it.  [Behnamiri Dep. at 55–56].  It is undisputed that except for perhaps looking at the house one time prior to the closing, Mr. Behnamiri never went to the house or visited Plaintiff there.[2]  [Pl.'s Dep. at 44, 139].

While there was no written sexual harassment policy at any of the three restaurants, by Plaintiff's own testimony, the restaurants' management did not tolerate sexually harassing behavior.  [Pl.'s Dep. at 252].  There were bouncers present on staff, and if patrons grabbed employees or otherwise acted inappropriately, their behavior was not ignored.  Depending on the severity of the behavior, the patrons would get thrown out, and the police were called.  "That was protocol."  [*Id.* at 252–55].  On one occasion, a customer grabbed Plaintiff at the restaurant on Halloween night, and the

---

[2]  Plaintiff testified that on several occasions shortly after she moved in, Mr. Behnamiri called and asked to stop by when he was in the neighborhood, but Plaintiff always refused and made up some type of excuse.  [Pl.'s Dep. at 44–47].

17

customer "got pummeled to the ground by the managers and the bouncers," and the police were called. [*Id.* at 252]. In Plaintiff's words, it "was a bar. It wasn't a church. People got drunk and made stupid decisions." [*Id.* at 252–54]. According to Mr. Negahdar, there was no written policy on sexual harassment because they had never had a problem with that kind of behavior, but their informal policy and practice was to always advise the waitresses and staff not to leave at the end of the night by themselves, or if they were being touched or mistreated by the customers, to let the manager on duty know, or one of the bouncers. [Negahdar Dep. at 62, 66].

Plaintiff's longterm boyfriend (and then fiance), Don Gatlin, was a bouncer at the Sandy Plains location during most of Plaintiff's tenure there. If there was a problem at the bar, she would go get him, and he would take care of it; "[t]hat was his job." [Pl.'s Dep. at 110–12]. Plaintiff and Gatlin worked together and dated for more than ten years. [*Id.* at 251]. According to Plaintiff, they had a very volatile relationship, with drinking and lots of jealousy involved on his part. [*Id.* at 110–15; Doc. 141-5, Deposition of Erin Pringle ("Pringle Dep."), at 43–44]. If he got jealous and thought she was flirting with customers and confronted her about her behavior, she would respond, "Yeah, I got an extra $5 tip, so what." [Pl.'s Dep. at 122]. Plaintiff testified that he was extremely jealous of everyone in her life—other men, her children,

18

everyone.  [*Id.*].  But because tending bar was her job and livelihood, she believed there was nothing he could do about it.  [*Id.* at 121].

In her lawsuit, Plaintiff alleges that from the time that she moved into the Canton house in approximately 2007 until she left her employment in late 2018, Defendant Behnamiri engaged in a regular pattern of sexual harassment and subjected her to a sexually hostile work environment by repeatedly kissing, hugging, touching, and making sexual advances toward Plaintiff in the workplace.  [Am. Compl. ¶¶ 20–21; Pl.'s Dep. at 10–11].  She testified that the unwanted touching was in the form of kisses on the cheeks and hugs in greeting when he would visit the restaurant, usually on Saturday nights, from approximately 10:30 p.m. till 1:00 or 1:30 a.m. [Pl.'s Dep. at 37; Negahdar Dep. at 35–36].  Occasionally, when Mr. Behnamiri arrived, he would "come behind the bar, cup my face in his hands and kiss me on the mouth [or the neck].  He would hug me, my lower waist, my hips . . . [and] pull me into him."  [Pl.'s Dep. at 34–35].  Plaintiff would make him drinks after he arrived. Plaintiff also at times greeted Mr. Behnamiri with hugs or kisses, as she did with other employees and customers with whom she had a friendship.  [*Id.* at 81].  On occasion, Mr. Behnamiri would ask Plaintiff to come outside and sit on the deck with him when he was at the Sandy Plains location.  [*Id.*  at 37–38].  Other times, Plaintiff left working

19

behind the bar on her own to visit with Mr. Behnamiri at his table or on the deck, telling the other bartender where she was going.  [Negahdar Dep. at 54].  She and Mr. Behnamiri would sit at a table during her cigarette breaks and chat about how business was going, if anything had happened that he needed to know about the business, and about his trips if he had been out of town; he would ask about her children and her life; and they would engage in other small talk, smoke, and sometimes drink alcoholic beverages together.  [Pl.'s Dep. at 41–43; Behnamiri Dep. at 71; Negahdar Dep. at 54; NSMF ¶ 21].  Coworker Erin Pringle testified that on those occasions when she joined them or happened to see Plaintiff out on the deck with Mr. Behnamiri, Plaintiff "was pretty much always jovial and laughing and funny until she had too much to drink."  [Pringle Dep. at 37].

Plaintiff has identified other instances, however, where she alleges that Mr. Behnamiri engaged in more serious, unwelcome and harassing conduct of a sexual nature.  According to Plaintiff, when they were alone, he would tell her she was looking beautiful, that he cared about her, if she had any idea how much he loved her; and he would grab her knees, legs, or face in his hands.  [Pl.'s Dep. at 42–43].  She described at least two incidents in Mr. Behnamiri's Lexus SUV when she was off-duty but at one of the restaurants as a customer.  Plaintiff could not recall when the first

20

incident occurred, but thought it might have occurred a "couple of years" after her divorce (which was in or around 2005), or maybe around 2010. [*Id.* at 76, 211–12]. Plaintiff testified that she was at the Sandy Plains location off duty, having drinks and dinner with Mr. Behnamiri. After "drinking for a few hours," it was time to leave. Mr. Behnamiri asked Plaintiff to come out to his car because he wanted to talk to her. [*Id.* at 71–73]. Plaintiff testified that when she got into his car, Mr. Behnamiri asked her if she had had fun; then he grabbed her face and started kissing her from the driver's seat and grabbing her face and breasts; he "got very, very, very forceful with my breasts, trying to pull my breast out of my shirt . . . took his hand, pushed me further back against the passenger side seat forcefully, and took his hand and shoved it between my legs, down my pants, and into me, inside of me (indicating)." [*Id.* at 64–76, 211–13, 215–16]. Plaintiff testified that she started crying and yelling, trying to figure out how to "get the hell out of his car." [*Id.* at 74]. She managed to get the door open and get out of the car, and Mr. Behnamiri "started profusely apologizing." [*Id.*]. But Plaintiff fled through the restaurant where Erin Pringle asked if she was okay; then Plaintiff got in her car, and left. [*Id.* at 74–76].

According to Plaintiff, the second and final incident in Mr. Behnamiri's car took place in 2017 in the front parking lot at the Sandy Plains location when Plaintiff says

AO 72A
(Rev.8/8
2)

Mr. Behnamiri asked her how she was doing, said he had missed her, and then kissed her on the side of her face and grabbed her "boobs." [Pl.'s Dep. at 207–08, 215–16]. Plaintiff testified that she told him, "I'm not doing this, I can't do this, I'm not going to kiss you, I'm not going to stay in your car, I'm not coming back in your car, you're not going to grab my boobs like this and—and try and make out with me in the parking lot." [*Id.* at 216]. Plaintiff testified that she never got into his car again after that. [*Id.* at 207–08].

Plaintiff also testified about several off-duty incidents, including a lunch at a sports bar called Jersey's in 2010 or 2011 with Mr. Behnamiri, coworker Erin Pringle, and one of Mr. Behnamiri's friends named Oscar, where they sat in a booth, had lunch, hung out, talked and laughed and drank alcohol for several hours. Plaintiff alleges that during that lunch, Mr. Behnamiri was "touchy/feely" with her, he kissed and hugged her, and she pushed him away. [Pl.'s Dep. at 55–56]. She described another off-duty episode at the Towne Lake location around 2010 that involved drinking and dancing, and unwelcome grabbing and kissing. She testified that there were also "a couple of luaus" where she met Mr. Behnamiri when she was not working, and he tried to kiss her, but she pushed him away. [*Id.* at 57–59]. At one of the yearly luaus, they just sat at the bar drinking for a few hours. [*Id.* at 61].

22

Plaintiff testified that during these off-duty events, she told Mr. Behnamiri to stop, and he would for a while, but his unwelcome conduct always recommenced. [Pl.'s Dep. 47–70, 207; Doc. 130-2 at 80].  Plaintiff states that she felt compelled to acquiesce to Mr. Behnamiri's "less egregious sexual behavior due to his control over her livelihood and her home."  [Doc. 154 at 5 (citing Pl.'s Decl. ¶¶ 6, 9)].

Plaintiff testified that after the incident at Jersey's and the incident in Mr. Behnamiri's car in 2017, she told her coworker, Erin Pringle, about the unwelcome conduct by Mr. Behnamiri.  [Pl.'s Dep. at 55–56, 75, 104–05, 191]. Ms. Pringle, however, denied this.  She testified that Plaintiff never informed her of any alleged harassment or unwelcome sexual contact, and that if she had, Ms. Pringle would have asked her father for advice and reported it to her manager, Mr. Negahdar; she would not just have sat by and done nothing.  Ms. Pringle testified that she never witnessed Mr. Behnamiri acting inappropriately with Plaintiff (or anyone else), or touching Plaintiff in a sexually harassing or inappropriate way during the ten years that she and Plaintiff worked closely together.  [Pringle Dep. at 15–16, 38–41].  Ms. Pringle testified she frequently went out to the patio when Mr. Behnamiri was there with Plaintiff, and they would be sitting at a table, smoking, talking, and occasionally drinking; she never saw Mr. Behnamiri touching Plaintiff at all, much less

AO 72A
(Rev.8/8
2)

inappropriately.  [*Id.* at 17–18].  As far as greeting Plaintiff or saying goodbye, Ms. Pringle testified that Mr. Behnamiri would occasionally take Plaintiff's face in his hands and give her a quick kiss, like he did with Ms. Pringle, but it was "a pop  kiss; not a romantic kiss."  [*Id.* at 18–19].  According to Ms. Pringle, Mr. Behnamiri was from Iran, and this was a common greeting for Persians and one that Mr. Behnamiri used with employees and regular customers alike, which she viewed as part of "their customs and their culture."  [*Id.* at 21–22].  Mr. Behnamiri denies engaging in any improper conduct with Plaintiff or with any other female employee at the three restaurants.  [Behnamiri Dep. at 68–72].

Mr. Negahdar testified that he witnessed Mr. Behnamiri hugging and kissing Plaintiff when he greeted her (and others), but that Plaintiff occasionally greeted Mr. Behnamiri, as well as other customers and coworkers, in a similar fashion.  [Doc. 142, NSMF ¶¶ 7, 8].  It is undisputed, however, that Mr. Negahdar never witnessed any of what Plaintiff contends were the more serious incidents of unwelcome conduct. [*Id.* ¶ 14; Pl.'s Dep. at 226].

Plaintiff testified that for the entire sixteen-year period that she worked at the restaurants, she reported solely to Hassan Negahdar, and they talked every day for the most part, unless it involved paper operations or something that the office manager,

Lena Rodriguez, would handle.  [Pl.'s Dep. at 187–88].  It is undisputed that despite Plaintiff's and Mr. Negahdar's close personal and business relationship, Mr. Negahdar's position as Plaintiff's general manager, and monthly management meetings where both were present, Plaintiff never complained to Mr. Negahdar or the office manager, Lena Rodriguez, about Mr. Behnamiri's alleged harassing conduct, or told them that the hugging and kissing, or any of the other conduct, was unwelcome or made her feel uncomfortable, or that she wanted it to stop.  [NSMF ¶¶ 6–9; Pl.'s Dep. at 191, 202, 230–31].   Plaintiff admitted that she never complained to Mr. Negahdar about Mr. Behnamiri because the two were friends, and Plaintiff believed that kind of conversation with Mr. Negahdar "wouldn't have gone anywhere . . . because he wouldn't have known what to say or what to say to me.  And it was embarrassing."  [Pl.'s Dep. at 231–32].  It is also undisputed that no other employee ever complained to Mr. Negahdar that Mr. Behnamiri was engaging in inappropriate conduct.  [NSMF ¶ 16].  Plaintiff testified that she never said anything to Don Gatlin (her longtime boyfriend who worked as a bouncer) about any of the incidents with Mr. Behnamiri's unwelcome conduct, and that Gatlin never asked her any questions about why Plaintiff went out on the patio with Mr. Behnamiri or if Mr. Behnamiri

AO 72A
(Rev.8/8
2)

made her feel uncomfortable.[3]  [Pl.'s Dep. at 115–19].

Plaintiff testified that during the sixteen years that she worked at the restaurants, she definitively recalls telling only two people, coworkers Eddie Peters and Erin Pringle, about the alleged harassment.  [Pl.'s Dep at 103–04, 190–91, 236].  As noted above, Ms. Pringle denies this.  Similarly, Eddie Peters does not support Plaintiff's version of the facts.  Mr. Peters, who worked with Plaintiff for nearly thirteen years, testified that he does not recall Plaintiff ever telling him that Mr. Behnamiri was engaging in harassing conduct or unwanted touching, and that he never witnessed Mr. Behnamiri touch Plaintiff inappropriately.  He testified that if he had seen such conduct, he "would've stopped it or said something to [Mr. Behnamiri]," and he would have also told Mr. Negahdar.  [Doc. 141-4, Deposition of Edwin Peters ("Peters

---

[3]  Plaintiff has submitted a declaration from Don Gatlin in response to the Corporate Defendants' motion for summary judgment and in support of her claims. [Doc. 155-2, Gatlin Decl.].  In that declaration, Gatlin states (in direct contradiction to Plaintiff's deposition testimony) that he had multiple discussions with Plaintiff about "Mr. Behnamiri's attentions," that he saw Mr. Behnamiri "act in an inappropriate sexual manner towards Ms. Donovan many, many multiples of times while working at The Place, putting his arm around her, pulling his close to him, touching at or near her lower back and backside, grabbing her face in both his hands and kissing her." [*Id.* ¶ 3]. He also states that on the "multiple occasions" that he considered or started to take action toward intervening, Plaintiff would object and tell him he could not do anything about it because Mr. Behnamiri owned her house.  [*Id.* ¶ 5].  The signature page for the declaration is different from the rest of the declaration and looks like it may have been added at a different time, but Plaintiff has not provided an explanation for the difference or for why her own testimony contradicts that of Gatlin.

AO 72A
(Rev.8/8
2)

Dep."), at 7, 15–16, 31]. Peters testified that although he never saw a written sexual harassment policy, he understood that if a female employee ever had a complaint about sexual harassment, she was supposed to complain to the manager or to Mr. Negahdar. [*Id.* at 15]. If Peters saw someone getting rowdy, getting a little bit too aggressive toward a female employee, or getting out of line, he would usually tell them to stop it, to calm down, or kick them out of the restaurant. [*Id.* at 14–15]. He also testified that he saw Plaintiff take lots of smoke breaks during busy times on the weekend for ten to fifteen minutes at a time, and leave the bar to go out on the patio. It happened so often that Peters complained to Mr. Negahdar about Plaintiff "always going out from behind the bar," because things were busy and he needed help. Mr. Negahdar responded by telling Plaintiff to stay behind the bar. [*Id.* at 8–11, 27–28; Pl.'s Dep. at 235]. Peters testified that over the course of thirteen years, he witnessed Mr. Behnamiri and Plaintiff hug every time Mr. Behnamiri came into the restaurant (which was only sporadically). He also saw Plaintiff hug her customers, and he saw Mr. Behnamiri kiss Plaintiff on the cheek probably ten times. [Peters Dep. at 7, 17, 23–25].

Starting in or around January 2014, Plaintiff began to fall behind in her mortgage reimbursement payments to Mr. Behnamiri. There are multiple text

27

messages between them in which Mr. Behnamiri tried to get Plaintiff to pay what she had agreed to pay, and Plaintiff gave excuse after excuse for why she was late on making her payments. [*See, e.g.*, Doc. 130-2 at 61–87]. The evidence shows that at times, Plaintiff was months behind on her payments. She sent text messages thanking Mr. Behnamiri for being patient with her, stating that she was having a difficult time financially, but that things were improving, and she did not want to lose her house or her job; "ypu [sic] have been beyond understanding and I couldn't be more appreciative." [Doc. 132-2 at 1]. Several of the checks she provided bounced when Mr. Behnamiri tried to deposit them. [*See* Doc. 130-2 at 67–70]. In 2015, when he asked her to leave a check for the mortgage at the restaurant, she merely responded by texting two heart emojis and a smiley face. [Doc. 132-2 at 3]. In May 2016, Mr. Behnamiri asked Plaintiff when she was planning on paying for her house, reminded her that the situation had been "going on for long time," and told her that if she did not make changes and stop it, he had no choice but to put the house on the market. [*Id.* at 4].

In February 2017, Mr. Behnamiri texted Plaintiff that her check had been returned (again), and that she needed to move out of the house because he was putting it on the market. [*Id.* at 5]. By August 2017, according to Mr. Behnamiri's text

28

messages, Plaintiff was $11,000 in arrears. [Doc. 130-2 at 70]. At that time, Mr. Behnamiri warned Plaintiff again that she was significantly behind in her payments, he could not keep paying the mortgage every month, and if the situation continued, he would need to hire an agent to sell the house. [*Id.* at 70–72].

In October 2017, Mr. Behnamiri texted Plaintiff that he had hired an agent to sell the house, and asked how soon she could move out. [*Id.* at 70]. Plaintiff first responded that she was sick in bed and would text him when she felt better. When he asked her when he could put the house on the market, Plaintiff responded that she wanted to do whatever was necessary to save her house, she had a friend interested in buying the house, and she would get back with him. [*Id.* at 71–72]. In December 2017, Mr. Behnamiri texted Plaintiff offering to pay her the portion of the down payment that she had made towards the house plus pay her moving expenses if she moved out: "I am not going to wait another month to see if your contact [is] going to show up." [Doc. 132-2 at 7]. In February 2018, he wrote, "You are behind on payment over a year now. I need to do something, I can't keep making payment every month." [*Id.*]. Plaintiff acknowledged in her deposition that she was having problems with making the payments during that time. [Pl.'s Dep. at 166].

29

By April of 2018, Mr. Behnamiri texted Plaintiff that she owed $18,480.  His

messages reflect that he clearly had run out of patience:

> **Mr. Behnamiri:** "I need a time frame.  I am not going to wait another two months for you to find solution.  I need money to pay for the house.  The payment is due on the 5th every month."

> **Plaintiff:** "Of course, I apologize.  I thought I would have seen you last week.  I'm sorry.  2 days and just checked my phone today.  Yes, of course I want to pay."

> **Mr. Behnamiri:** "Ok.  You owe $18,480.00.  When are you going to pay?  I need an answer from you on what you want to do?"

> **Plaintiff:** "I have been in Lake Arrowhead for several days. Dealing with a family emergency.  I'm going to get with Ms. Vicky [the mortgage broker who sold Mr. Behnamiri the house], she was out of town last week and I've had a death in my family this week.  I'll call her when I get to work this morning."

> **Mr. Behnamiri:** "I know you are working today, leave a check in the office for what you owe. This is your last opportunity."

[Doc. 130-2 at 72–73].  On May 2, 2018, Mr. Behnamiri wrote, "Your check has

bounced for NSF.  You must move out, this is your last notice."  [*Id.* at 73].  In July

and August 2018, Plaintiff's checks were again returned for insufficient funds.

Plaintiff apologized again and said she had been out of town in West Virginia and

30

forgot to make a deposit.  [*Id.* at 74].  In September 2018, Plaintiff made no monthly mortgage payment, explaining that her car was in the shop.  [*Id.* at 74–75].

On September 26, 2018, Mr. Behnamiri informed Plaintiff he had hired an attorney to help him with the situation, and "[t]here is no point of talking." [Doc. 130-2 at 75].

Sometime in early to mid September 2018, Plaintiff notified Mr. Negahdar that she had taken a couple of weeks to think about it, and she had decided it was in her best interest to stop working at the restaurant and "move on"; she had accepted a position as bar manager with a friend's new restaurant in Canton, Nuevos Amigos, but wanted to stay on through Christmas and leave in January because Nuevos Amigos was not ready to open yet.  [Pl.'s Dep. at 192–93; Negahdar Dep. at 56].  A couple weeks after Plaintiff gave notice, Mr. Neghadar and Lena Rodriguez, the office manager, found a good candidate to replace Plaintiff and hired her to work the day shifts.  To accommodate that hire and the restaurant's needs, Mr. Negahdar changed Plaintiff's shifts from working three daytime shifts to working three nighttime shifts (including a shift on Sunday night, 'the least busiest night of the week" according to Plaintiff, and one on Tuesday night).  [Pl.'s Dep. at 219; Negahdar Dep. at 57, 59–61]. Plaintiff contends that Mr. Negahdar gave her "the crappy shifts basically," so she

31

decided not to return to work and never came back.  [Pl.'s Dep. at 219–20].

On December 3, 2018, Mr. Behnamiri texted Plaintiff again, and asked if she had decided what she was going to do about the house.  Plaintiff replied as follows:

> Hi Moe.  I don't understand what you expect me to decide on.  You bought the house for me, which I have witnesses.  You thought the house was going to be a place for you and I to spend time together.  I worked for you for 16 years despite the failing business.  I couldn't afford to properly take care of my children, but I stayed loyal.   I got sick and had to have major surgery.  The Place never even offered to help when i was out of work, you wanted to give me money to leave.  Then i find a much better paying job, and gave a 4 month notice, i was doing right by you.  Then Hassan took away my shifts, leaving me unemployed, and you try to evict me and my family a week before Christmas.

[Doc. 130-2 at 75].

Plaintiff testified that in or around this time, Plaintiff received from Mr. Behnamiri's attorney a statutory notice to vacate the house she lived in by a certain date prior to Christmas, or face eviction.  [Pl.'s Dep. at 153, 170–72].

Plaintiff, however, did not move out.  Since the time she received that notice, Plaintiff has not made any payments on the house, and as of the time the motions for summary judgment were filed in the fall of 2020, Plaintiff was still living in the house with her children.  [*Id.* at 172–73].  She testified she has not paid any of the taxes, insurance, or homeowner's association fees on the house since before the litigation

began.  [*Id.* at 173].

Instead, on February 1, 2019, Plaintiff filed a claim of gender discrimination, sexual harassment, constructive discharge, and retaliation under Title VII with the Equal Employment Opportunity Commission ("EEOC") against Mr. Behnamiri and Behnamiri & Associates, LLC/The Place.  [Doc. 143-3 at 2–3].  On June 13, 2019, she filed the instant lawsuit, alleging sexual harassment under Title VII and the state law claims mentioned above. [Doc. 1].  On November 4, 2019, Plaintiff filed an Amended Complaint, adding two corporate defendants and a Title VII retaliation claim against Mr. Behnamiri based on counterclaims he asserted in his answer.  The Amended Complaint is now the operative complaint before this Court.  [Doc. 38, Am. Compl.].

As noted earlier, there are four pending motions for summary judgment, or partial summary judgment, which I will address in turn.

IV.    **ANALYSIS**

    A.    **Federal Title VII Claims (Counts One and Two)**

        1.    **Sexual Harassment/Hostile Work Environment (Count One)**

In Count One of her Amended Complaint, Plaintiff alleges that throughout the entire period of her employment (from 2002 through September 2018), she was subjected to a sexually hostile work environment by Mr. Behnamiri on the basis of

33

gender.  [Doc. 38 at 9].  Plaintiff alleges that Mr. Behnamiri regularly engaged in kissing, touching, sexual overtures, and similar conduct against Plaintiff and other female staff.  [*Id.* ¶ 35].  She alleges that such actions were unwelcome, both subjectively and objectively offensive, as well as severe and pervasive, and created an atmosphere of humiliation, fear, and intimidation in the workplace.  Plaintiff alleges that Mr. Behnamiri's sexual harassment of her resulted in emotional and mental distress for which she intends to seek damages at trial.  [*Id.* ¶¶ 36–38].

Title VII prohibits employment discrimination with respect to an employee's compensation, terms, conditions, or privileges of employment, because of the individual's sex.  42 U.S.C. § 2000e-2(a)(1).  "Employees of either gender may experience discrimination or harassment in a variety of different forms, one of which is unwelcome sexual advances."  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1274 (11th Cir. 1999).  Although Title VII does not mention the term "sexual harassment," courts have long recognized that Title VII prohibits such conduct.  *Id.*  Actionable sexual harassment occurs when inappropriate sexual conduct causes a hostile work environment that is sufficiently severe or pervasive to alter the terms and conditions of work.  *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004).

To establish a hostile work environment/sexual harassment claim under

34

Title VII, an employee must allege and prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis exists for holding the employer liable. *Mendoza*, 195 F.3d at 1245; *Hulsey*, 367 F.3d at 1244.

### a.    Individual Defendants Benhamiri and Negahdar

As noted above, to the extent Plaintiff is attempting to assert a Title VII claim for hostile work environment/sexual harassment against Mr. Behnamiri (and/or Mr. Negahdar) in Count One of her Amended Complaint, her claim fails because Title VII claims may be brought only against an "employer," as defined in the statute, and there is no individual liability under Title VII.  *See Dearth*, 441 F.3d at 933. Accordingly,  I recommend that summary judgment be granted on Plaintiff's Count One Title VII claim for hostile work environment/sexual harassment against individual defendants Behnamiri and Negahdar.

35

### b.   Corporate Defendants

The Corporate Defendants have moved for summary judgment on Plaintiff's Count One claim of sexual harassment on two grounds: (1) Plaintiff's claim is barred by failing to timely file her charge with the EEOC; and (2) Plaintiff has failed to establish a prima facie case of Title VII sexual harassment/hostile work environment. [Doc. 143-1 at 9–20].

The Corporate Defendants first argue that Plaintiff's Title VII hostile work environment/sexual harassment claim is barred because she failed to file her charge of discrimination with the EEOC within 180 days of the alleged unlawful conduct.

Title VII requires a plaintiff to first exhaust the available administrative remedies by filing a charge of discrimination with the EEOC before filing a lawsuit in federal court.  *See* 42 U.S.C. § 2000e-5; *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).  In a non-deferral state such as Georgia, the plaintiff must file the EEOC charge within 180 days of the date of the alleged discrimination. 42 U.S.C. § 2000e-5(e)(1).  Failure to file the charge within 180 days of the alleged unlawful employment practice bars the claim.  *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1346 (11th Cir. 2000), overruled in part on other grounds by *Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003) (en banc).

36

Here, Plaintiff filed her EEOC charge of discrimination on February 1, 2019, several months after she voluntarily left her employment at the restaurant(s).[4] [Doc. 140-2 at 2, Pl.'s "EEOC Charge"]. One hundred and eighty days prior to February 1, 2019 is August 5, 2018. As such, in order for Plaintiff's Title VII harassment claim to be timely, she must present evidence that at least some of the unlawful conduct about which she is complaining took place on or after August 5, 2018. Liability under Title VII is dependent on Plaintiff's timely asserting her charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1); *Jones v. Allstate Ins. Co.*, 707 F. App'x 641, 647 (11th Cir. 2017).

In her EEOC Charge, Plaintiff alleged that the earliest date the alleged discrimination took place was 2004, and that Mr. Behnamiri's "pattern of sexual harassment" continued until 2018. [Doc. 140-2 at 2]. Plaintiff did not include a specific date or month. [*Id.*]. Normally, in an EEOC charge, a claimant will specify the month and day of the alleged unlawful conduct, as well as the year. But in this case, there is no indication in the EEOC Charge when Plaintiff left her employment

---

[4] Plaintiff's signature on the EEOC charge is dated December 22, 2018, but the parties appear to agree that the charge was not filed with the EEOC until February 1, 2019, the filing date indicated in the EEOC's right-to-sue notice. [Doc. 143-3 at 2–3; Am. Compl. ¶ 10; Doc. 145, Corporate Defendants' Stmt. of Mat. Facts ("CDSMF") ¶ 30; Doc. 159 at 3, Pl.'s Resp. to CDSMF ¶ 30]. I raised this issue at oral argument, and counsel all agreed that the operative date was February 1, 2019.

with the Defendants, or when any particular act of alleged sexual misconduct or harassment actually occurred.  The EEOC Charge merely alleges that Mr. Behnamiri "began a regular pattern of sexual harassment" after she moved into the house, and he "sexually harassed me at work almost every day."  [*Id.*].  The undisputed evidence, however, does not support the "almost every day" assertion in the EEOC Charge. Rather, the evidence shows that during the relevant period, Mr. Behnamiri visited the restaurant where Plaintiff was working at the most two or three times a month, mostly on Saturday nights.  [*See, e.g.,* Doc. 145, CDSMF ¶ 16; Doc. 159, Pl.'s Resp. ¶ 16]. Plaintiff's charge further alleges that Mr. Behnamiri "regularly kissed me, touched me, and subjected me to sexual comments and sexual advances for many years," that she "objected to his actions, but he did not stop," and that after she gave several months notice, he began trying to evict her from her home.[5]  [Doc. 140-2 at 2].

Liability under Title VII depends upon the timely filing of an EEOC charge alleging the conduct inconsistent with Title VII.  *See Jones*, 707 F. App'x at 647 (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001)).  As noted above, the deadline for filing an EEOC charge of discrimination in Georgia is 180 days

---

[5]  I note that the EEOC Charge does not mention the alleged sexual assaults in the car, the last of which took place sometime in 2017, well outside the 180 day window for filing a claim with the EEOC.

AO 72A
(Rev.8/8
2)

after the alleged discriminatory act.  *Id.* (citing *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005)).  To be timely, the hostile work environment or sexual harassment had to exist on or after August 5, 2018.

The Supreme Court has "instructed that a hostile work environment, although comprised of a series of separate acts, constitutes one 'unlawful employment practice' and so long as one act contributing to the claim occurs within the filing period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'"  *Id.* (citations omitted).  A series of harassing conduct comprises the same hostile work environment where the "pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* (citing *National R.R Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002)).  To demonstrate a continuing violation, a plaintiff must show (1) the occurrence of a specific act of discrimination within the filing period and (2) a link between this act and the alleged misconduct outside of the filing period which forms the basis of plaintiff's complaint. *Harris v. Fulton-DeKalb Hosp. Auth.*, 255 F. Supp. 2d 1347,  1366 (N.D. Ga. 2002) (citing *Chawla v. Emory Univ.*, No. 1:95-cv-0750-JOF, 1997 WL 907570, at *8 (N.D. Ga. Feb. 12, 1997)).

39

Here, except for Plaintiff's own vague and conclusory statements in her declaration that Mr. Behnamiri's kissing and touching "occurred on a regular basis throughout my employment . . . until very close to the time I resigned in September 2018," Plaintiff has offered no probative evidence to establish that she was sexually harassed or subjected to a hostile work environment on or after August 5, 2018. Plaintiff testified that during the last seven or eight months she worked at The Place, Plaintiff was working only during the day.    [Pl.'s Dep. at 200–201].    The uncontroverted evidence shows that Mr. Behnamiri chiefly visited The Place late in the evening a couple Saturday nights a month; thus, their schedules did not align.  Also, the series of emails between Plaintiff and Mr. Behnamiri during the July to September 2018 time period show little to no contact between the two, as well as Plaintiff's repeated absences from work.  Although Plaintiff's allegations of repeated sexual assaults and other overt unwelcome kissing and touching are very troubling, if true, her deposition testimony indicates that most of that conduct occurred years before she left her employment with the Defendants, and the more serious incidents took place when she was off duty engaging in social events or voluntarily socializing with Mr. Behnamiri.

At oral argument, when asked what evidence there is in the record to support

40

Plaintiff's claim that she timely filed her EEOC Charge, Plaintiff's counsel pointed to the declaration of Pamela Lee, a customer at the Sandy Plains location, who stated in a declaration that "[i]n or around August 2018, I was in The Place restaurant. Mr. Behnamiri came up behind Ms. Balius, put his arms around Ms. Balius and put his face close to hers, either kissing her or whispering in her ear. She was very busy at the time, and I noticed that she seemed taken aback, or surprised." [Doc. 154-5, "Statement of Pamela Lee," at 2]. Out of almost eight hundred pages of evidence, however, this was the sole evidence Plaintiff's counsel pointed to in support of Plaintiff's position that her Title VII sexual harassment claim is not barred by the EEOC's 180-day rule. I conclude that, when viewed in the light most favorable to Plaintiff, this evidence is fatally vague, a mere "scintilla" of evidence that the Eleventh Circuit has deemed insufficient to defeat a properly supported motion for summary judgment. *See Garczynski*, 573 F.3d at 1165. Plaintiff has pointed to no probative evidence from which the Court could infer what particular conduct Plaintiff was alleging in her EEOC Charge that Mr. Behnamiri engaged in on or after August 5, 2018 that she contends constitutes actionable sexual harassment or gender discrimination. [Doc. 154, Pl.'s Decl. ¶ 5; Doc. 140-2 at 2].

There is simply no probative evidence of any specific act of sexual harassment

41

or sexual misconduct on or after August 5, 2018. As such, Plaintiff has not satisfied her burden to establish that such conduct occurred at the workplace within the 180-day window required by Title VII for filing a timely charge of discrimination with the EEOC. And thus, Plaintiff has not shown that her allegations constitute a continuing violation.

For these reasons, I conclude that Plaintiff has failed to meet her burden to establish that her EEOC Charge was timely filed. Thus, Plaintiff's Count One Title VII claim of sexual harassment against the Corporate Defendants is barred for failure to timely file her charge with the EEOC.[6] I therefore RECOMMEND that the Corporate Defendants' motion for summary judgment on Plaintiff's Count One claim be GRANTED.

---

[6] Because I have concluded that Plaintiff's Title VII hostile work environment/sexual harassment claim is barred, I have not addressed other arguments in the motion, including whether the conduct was sufficiently severe and pervasive so as to alter the condition of Plaintiff's employment. If the district judge disagrees with my conclusion as to the timeliness issue, the case can be returned to me for additional analysis.

42

### 2.    Retaliation (Count Two)

In Count Two of her Amended Complaint, Plaintiff claims retaliation under Title VII based on Mr. Behnamiri's assertion of counterclaims against her in this litigation.  [Doc. 38, Am. Compl., at 9–10].  Plaintiff's Amended Complaint alleges that she engaged in protected conduct by filing the instant lawsuit, and that, in response, Mr. Behnamiri retaliated against her by filing what she contends were frivolous and baseless counterclaims intended solely to be a punitive measure against her, entitling her to damages, including compensatory and punitive damages, attorney's fees, and costs.  [*Id.*].

### a.    Corporate Defendants

The Corporate Defendants (who are represented by separate counsel from Mr. Behnamiri) point out that they did not file any counterclaims against Plaintiff, and thus, they are entitled to summary judgment on this claim.  Indeed, the record is clear that only Mr. Behnamiri, in his individual capacity, filed counterclaims.

In Plaintiff's response, she does not dispute that the Corporate Defendants are entitled to summary judgment on this claim.  Because the Corporate Defendants did not file any counterclaims against Plaintiff, I RECOMMEND that the Corporate Defendants' motion for summary judgment on Plaintiff's Count Two Title VII

retaliation claim be GRANTED.

### b.   Mr. Behnamiri

In Count Two of her Amended Complaint, Plaintiff alleges that Mr. Behnamiri retaliated against her, in violation of Title VII, by filing baseless counterclaims against her in retaliation for filing her lawsuit against him. [Am. Compl. at 9–10]. The heading of Count Two includes the words "Title VII," making clear that this claim is brought under that statute. [*Id.*]. To support her claim, Plaintiff cites a Northern District of Georgia case, *Obester v. Lucas Assocs., Inc.*, No. 1:08-cv-3491-MHS-AJB, 2010 WL 8292401 (N.D. Ga. Aug. 2, 2010), for the proposition that a plaintiff may assert a claim of retaliation under Title VII when, in response to the plaintiff's lawsuit, a defendant files counterclaims for a retaliatory motive that are without legal justification or basis. [Doc. 127-1 at 12].

Some courts have held that under some circumstances, an employer's baseless claims or lawsuit designed to deter a claimant from seeking legal redress can constitute actionable retaliation (especially in FLSA actions). *See, e.g., Munroe v. PartsBase, Inc.*, No. 08-80431-CIV, 2009 WL 413721, at *8 (S.D. Fla. Feb. 18, 2009) (citing *Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008) (finding allegation that plaintiff's employer filed a lawsuit against him alleging fraud with a retaliatory motive

44

and without a reasonable basis in fact or law was an actionable adverse employment action under the FLSA).  For a plaintiff to prevail on such a claim, the plaintiff must demonstrate that the defendant employer's counterclaims (1) were filed for a retaliatory motive and (2) lack a reasonable basis in fact or law.  *See id.*

In addition to *Obester*, Plaintiff has cited several other cases to support her retaliation claim.  None of the cases, however, including *Obester*, support the proposition that Plaintiff is entitled to assert a ***Title VII*** retaliation claim against an individual rather than her employer or former employer.  *Obester* is inapposite because that involved a Title VII claim against the employer/company, not against an individual defendant.  Moreover, the defendant employer in that case filed a stipulation of dismissal as to its trade secret counterclaims prior to the plaintiff's motion for summary judgment being ruled on.  Accordingly the plaintiff's motion for summary judgment as to the counterclaims was denied as moot.  *Obester*, 2010 WL 8292401, at *9.  The other cases cited by Plaintiff are also inapplicable and of little assistance because most do not involve Title VII, and all were asserted against the employer.  [*See* Doc. 127-1, Pl.'s Resp. Br., at 12–13, citing *Ramos v. Hoyle*, No. 08-21809-CIV, 2009 WL 2151305 (S.D. Fla. July 16, 2009) (asserting claims under the FLSA, the Florida Minimum Wage Act, breach of contract, fraud, and a violation of the

45

Trafficking Victims Protection Reauthorization Act, but no Title VII claims); *Munroe v. PartsBase, Inc.*, No. 08-80431-CIV, 2009 WL 413721 (S.D. Fla. Feb. 18, 2009) (another Florida FLSA case, concluding that the plaintiff could not meet both elements required to prove that the defendants' counterclaims constituted actionable FLSA retaliation, and granting summary judgment on the plaintiff's FLSA retaliation claim); *Hill v. Lazarou Enters., Inc.*, No. 10-61479-CIV, 2011 WL 1331272 (S.D. Fla. Mar. 17, 2011) (plaintiff's claim for Title VII retaliation filed solely against the corporate defendant/employer); *Williams v. Smith, White, Sharma & Halpern, P.A.*, No. 1:09-cv-0105-TCB-AJB, 2009 WL 10669537 (May 20, 2009) (granting motion for leave to amend to add claims for retaliation under Section 1981 and the FLSA against plaintiff's former employers for filing retaliatory counterclaims); *Wilcoxson v. Physician's Aesthetics*, No. 1:19-cv-1041-SCJ, 2019 WL 8277257 (N.D. Ga. Oct. 15, 2019) (granting motion for leave to file an amended complaint to add a claim for retaliation against her employers under the FLSA after finding that "[t]he existence of retaliatory intent alone is a factual determination that does not lend itself to resolution on a motion to dismiss").[7]

---

[7] The cases cited by Plaintiff to show direct evidence of retaliatory intent do not change the result. [*See* Doc. 127-1 at 14–15, citing *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (reversing district court's grant of summary judgment to employer where the plaintiff was a supervisor involved in sexually

AO 72A
(Rev.8/8
2)

In this case, Plaintiff clearly is alleging a Title VII retaliation claim against an individual.  Plaintiff has failed to establish that Mr. Behnamiri was her employer, and he is the only defendant that she has filed her Title VII retaliation claim against. Accordingly, Plaintiff cannot prevail on her claim of Title VII retaliation against Mr. Behnamiri, individually, and summary judgment on Plaintiff's Title VII retaliation claim against Mr. Behnamiri is appropriate.

I therefore RECOMMEND that Mr. Behnamiri's motion for summary judgment on Count Two be GRANTED and that Plaintiff's cross motion for summary judgment on this count be DENIED.

### 3.    Federal Claims Summary and Recommendation

Counts One and Two are the only federal claims asserted in Plaintiff's Amended Complaint.  The remaining counts, Three through Seven, assert state law claims.   If the district judge adopts my recommendations with respect to Counts One and Two

---

harassing an employee; he reluctantly gave testimony in her lawsuit; then he was terminated in retaliation for what he said during that deposition, in violation of Title VII's anti-retaliation participation clause); *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999) (concluding that a supervisor telling a subordinate employee who filed an EEO gender discrimination claim against him that her career was going nowhere, she was no longer worthy of his trust, and refusing to recommend her for advanced training courses because she exhibited a bad attitude in filing her discrimination claim was direct evidence of a retaliatory attitude, and the evidence her employer, the U.S. Postal Service, retaliated against her under Title VII was sufficient to submit to a jury).

and grants summary judgment in favor of the defendants on those claims, there will be no federal question jurisdiction. *See* 28 U.S.C. § 1331. Nor will there be diversity jurisdiction, given the fact that all the parties in this case appear to be citizens of Georgia. *See* 28 U.S.C. § 1332. Thus, there will be no original jurisdiction.

Where, as here, a district court dismisses all claims over which it has original jurisdiction, a federal court is permitted to adjudicate state law claims that are so related to claims in the action within the court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Alternatively, the district court may decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) & (c)(3). Thus, this court's exercise of supplemental jurisdiction over the remaining state law claims—assuming they form part of the same case or controversy as Plaintiff's federal claims—is discretionary. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (recognizing that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Eubanks v. Gerwen*, 40 F.3d 1157, 1161 (11th Cir. 1994) (stating that the district court's supplemental jurisdiction is discretionary).

Given my recommendation that summary judgment be granted in favor of the defendants on all of Plaintiff's federal claims, I further RECOMMEND that this Court

decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss those claims without prejudice.

Nevertheless, and to assist the district judge in deciding whether to exercise supplemental jurisdiction, I provide the following analysis of Plaintiff's state law claims. In the event the district judge elects to exercise supplemental jurisdiction, I also provide my recommendations regarding disposition of the state law claims.

## B. State Law Claims

### 1. Battery, against Mr. Behnamiri[8]

Individual Defendant Mahmoud Behnamiri has moved for summary judgment or, in the alternative, for partial summary judgment on Plaintiff's claims against him. [Doc. 130]. At oral argument, however, Mr. Behnamiri's attorney clarified that he did not move for summary judgment on the battery claim because he recognized that there were fact disputes regarding Mr. Behnamiri's liability for battery. Accordingly, should the district judge exercise supplemental jurisdiction, this claim would remain.

_____

[8] The Corporate Defendants moved for summary judgment on this claim. [Doc. 143-1 at 11]. Plaintiff did not respond to their argument. At oral argument, Plaintiff's counsel stated that Plaintiff intended to assert this claim only against Mr. Behnamiri. Accordingly, to the extent Count Three of the Amended Complaint appears to assert a claim for battery against the Corporate Defendants, I RECOMMEND that the Corporate Defendants' motion for summary judgment be GRANTED as to that claim.

49

Otherwise, I RECOMMEND that Plaintiff's Count Three claim of battery against Mr. Behnamiri be DISMISSED WITHOUT PREJUDICE to refiling in a state court action.

### 2. Negligent Supervision and Retention, against Mr. Negahdar[9]

Count Four alleges that as part owner and manager, Mr. Negahdar had a duty to reasonably protect the employees who worked for the Defendants, that he failed to act responsibly in taking any action to prohibit or prevent the sexual harassment of Plaintiff in the workplace, "which was ongoing, open and obvious," and that he "approved and ratified Behnamiri's abusive conduct, which he frequently witnessed." [Am. Compl. ¶¶ 50–52].   Mr. Negahdar has moved for summary judgment on this claim.  [Doc. 140].

---

[9] The Corporate Defendants also moved for summary judgment on Plaintiff's Count Four claim for negligent supervision and retention.  [Doc. 143-1 at 11–12, 22–25]. In her consolidated response brief, Plaintiff failed to respond to their argument. [Doc. 154].  I therefore conclude that Plaintiff has abandoned this claim as against the Corporate Defendants.  *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (stating that a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned); *see also Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) (providing that "[w]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."). Thus, to the extent Plaintiff asserted a claim for negligent supervision and retention against the Corporate Defendants, I RECOMMEND that their motion for summary judgment be GRANTED.

AO 72A
(Rev.8/8
2)

Under Georgia law, a defendant employer "is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency." O.C.G.A. § 34-7-20. A defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's tendencies or propensities that the employee could cause the type of harm sustained by the plaintiff; the employer is subject to liability only for such harm as is within the risk. *See Herron v. Morton*, 155 F. App'x 423, 425–26 (11th Cir. 2005) (citing *Munroe v. Universal Health Servs., Inc.*, 277 Ga. 861, 868, 596 S.E.2d 604, 606 (2004)); O.C.G.A. § 34-7-20. To prevail on such a claim, a plaintiff must show not only that the plaintiff's alleged employer should have known of [the offending employee's] sexual harassment, but also that it "was foreseeable that [the offending employee] would engage in sexual harassment of a fellow employee if he was continued in his employment." *Herron*, 155 F. App'x at 426 (quoting *Coleman v. Housing Auth. of Americus*, 191 Ga. App. 166, 381 S.E.2d 303, 307 (1989)). Essential to a negligent supervision claim is an employee/employer relationship. *See id.* at 425. Thus, the crucial question in assessing liability for a negligent retention and supervision claim is whether "the ***employer*** knew or reasonably should have known

51

of the ***employee's*** propensity to engage in the type of conduct that caused the plaintiff's injury." *Id.* at 425–26 (emphasis added) (citing *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1247 (11th Cir. 2001); *Munroe v. Universal Health Servs., Inc.*, 277 Ga. 861, 596 S.E.2d 604, 606 (2004)); *see also* O.C.G.A. § 34-7-20 (addressing the care required of an "employer").

Mr. Negahdar argues that Mr. Benhamiri was not an employee of any of the restaurants and that there was no employer/employee relationship between Mr. Negahdar and Mr. Benhamiri.  The evidence demonstrates that Mr. Behnamiri was the majority owner of two of the businesses; there is no evidence to suggest that he was an employee of the restaurants.[10]  [NSMF ¶¶ 4, 31].  I note that the operating agreements for the Corporate Defendants reflect no  employer/employee relationship between Mr. Negahdar and Mr. Behnamiri.  Rather, the agreements show that Mr. Negahdar is a salaried employee and minority owner (20%) of the Sandy Plains and Towne Lake locations, and Mr. Behnamiri is the majority owner (80%) of those locations.

Plaintiff argues that based on the operating agreements, Mr. Negahdar had

---

[10]  Plaintiff has asserted no allegations of sexual harassment, retaliation, or any other claim (including negligent supervision and retention) with regard to the Hiram location, owned and operated by the third corporate entity, B&N Partners, LLC, in which Mr. Behnamiri and Mr. Negahdar each hold a 50% ownership interest.

AO 72A
(Rev.8/8
2)

plenary authority over the workplace, and he promoted an atmosphere in which employees and customers alike were subjected to sexual advances and other misconduct. [Doc. 155, Pl.'s Resp. Br., at 9–10]. Plaintiff argues that a typical employer/employee relationship is not required in order to succeed on a claim for negligent supervision and retention because Georgia law extends those claims "beyond such artificial bounds." [*Id.* at 11]. The cases Plaintiff cites, however, are distinguishable; they involve claims of vicarious liability of franchisors, and premises liability involving negligent utilization of volunteers, neither of which are at issue here. [*See id.*, citing *New Star Realty, Inc. v. Jungang PRI USA, LLC*, 346 Ga. App. 548, 562–63, 816 S.E.2d 501, 513 (2018) (noting that a franchisor could face liability for the negligent training and supervision of franchisee employees "if the franchisor undertook a duty to involve itself in the day-to-day operations of the franchisee or assumed the right to control the manner in which the franchisee executed its work," but ultimately holding that there was no vicarious or direct liability where, as here, the defendant was not the employer of the individuals at issue in the lawsuit who allegedly harmed the plaintiff); *Piney Grove Baptist Church v. Goss*, 255 Ga. App. 380, 384–85, 565 S.E.2d 569, 572–73 (2002) (affirming the denial of summary judgment on the basis that an issue of fact remained regarding whether a church was negligent in the

53

selection and retention of a volunteer).  Plaintiff has failed to cite to any case on point

regarding negligent supervision and retention claims such as hers—where a plaintiff

seeks to hold a minority owner and manager liable for acts of the majority owner.  In

the absence of such case law, I conclude that her claim fails as a matter of law.

Moreover, Plaintiff has failed to come forward with evidence to create a material

fact dispute as to whether Mr. Negahdar had knowledge of any past or prior conduct

by Mr. Behnamiri that would have led Mr. Negahdar to believe that Mr. Behnamiri had

a tendency or propensity to engage in sexual harassment of employees.  Where the

record is devoid of evidence suggesting that an employer knew or should have known

that an employee previously engaged in the type of conduct that allegedly caused

plaintiff's injuries, a court is correct in granting summary judgment as it relates to a

negligent supervision and retention claim.  *See Leo v. Waffle House, Inc.*, 298 Ga. App.

838, 841, 681 S.E.2d 258, 262 (2009).

For the reasons stated, Plaintiff's Count Four claim against Mr. Negahdar for

negligent supervision and retention is without factual or legal merit.  Accordingly, if

the district judge elects to exercise jurisdiction over the state law claims,

I RECOMMEND that Mr. Negahdar's motion for summary judgment as to Count Four

of Plaintiff's Amended Complaint [Doc. 140] be GRANTED.   Otherwise,

54

I RECOMMEND that Plaintiff's Count Four claim of negligent supervision and retention be DISMISSED WITHOUT PREJUDICE.

### 3.    Fraud, against Mr. Behnamiri

In Count Five of Plaintiff's Amended Complaint, Plaintiff alleges that Mr. Behnamiri defrauded Plaintiff by repeatedly making misrepresentations of fact with regard to his intention and/or the effect of what she contends was the joint purchase of Plaintiff's residence in Canton, Georgia.  [Am. Compl. ¶ 55].  She alleges that "[a]t the time of the property transaction, Defendant Behnamiri repeatedly stated to Plaintiff and others his intention that the property was to belong to her, that she was entitled to use and possess same, and that he would not take action to interfere with her use and possession of the premises."  [*Id.* ¶ 56].  Plaintiff alleges that she reasonably believed that Mr. Behnamiri intended to honor this commitment until he took steps to evict her from the home.  [*Id.*].  Plaintiff alleges that she relied upon Mr. Behnamiri's misrepresentations, making payments for the property at the time of the purchase and regularly over the next number of years, "as well as by maintaining, renovating, and repairing the premises."  [*Id.* ¶ 57].  She asks this Court to use its equitable authority to have legal title vested in her name.  [*Id.* ¶ 58].

In Georgia, the elements of a fraud claim are: (1) a false representation by a

AO 72A
(Rev.8/8
2)

defendant; (2) scienter; (3) intention to induce the plaintiff to act or to refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *See Fortson v. Hotard*, 299 Ga. App. 800, 802–03, 684 S.E.2d 18, 21 (2009).

Both federal and state law require the plaintiff to plead with particularity the circumstances constituting fraud. *See* FED. R. CIV. P. 9(b); O.C.G.A. § 9-11-9(b). The facts alleged, accepted as true, must show:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and

> (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and

> (3) the content of such statements and the manner in which they misled the plaintiff, and

> (4) what the defendant obtained as a consequence of the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation marks and citation omitted); FED. R. CIV. P. 9(b); *see also Leonard v. Stuart-James Co., Inc.*, 742 F. Supp. 653, 659 (N.D. Ga. 1990) (granting motion to dismiss where complaint failed to allege "specifically when, where, by whom, or specifically what that misrepresentation was.").

Here, Plaintiff's Count Five fraud allegations fail to state a valid claim for fraud

AO 72A
(Rev.8/8
2)

because her Amended Complaint fails to plead facts with sufficient particularity to demonstrate what specific false representation she contends was made by Mr. Behnamiri, what act he intended to induce her to engage in or to refrain from engaging in, what damages she has suffered, and what Mr. Behnamiri allegedly "obtained as a consequence of the fraud." *Brooks*, 116 F.3d at 1371.

In her response brief to Mr. Behnamiri's motion for summary judgment, Plaintiff argues that Mr. Behnamiri, an experienced real estate investor, was the one who first suggested the idea of purchasing a house, and he repeatedly stated his intention that the home would belong to Plaintiff, which Plaintiff now contends was a fraudulent statement. [Doc. 154 at 19–20]. She contends that his subsequent actions show that he never intended for her to own the home, but instead he intended to own it himself, "which had the effect of giving him complete control over [Plaintiff's] housing arrangements." [*Id.* at 20]. Plaintiff contends that prior to the closing (which took place in or around 2007), Mr. Behnamiri insisted on changing the terms of the purchase so that the home would be an investment and titled in his name alone. Ms. Vickery testified that prior to the closing, she asked both Mr. Behnamiri and Plaintiff if he was going to sign a quitclaim deed at closing for half the house in order to protect Plaintiff's interest, but Mr. Behnamiri told Ms. Vickery no. It is undisputed

AO 72A
(Rev.8/8
2)

that the changes in the structure of the real estate purchase were explained to Plaintiff in advance of the closing, and she accepted the new arrangement with Mr. Behnamiri purchasing the house alone because Mr. Behnamiri's "rates were far, far better than mine. So I was—it was just a much more beautiful deal, . . . a better deal than what I could do on my own. Yes, it was better, and it would save me a lot of money." [Pl.'s Dep. at 148–49; BSMF ¶¶ 20–29]. The agreement was always, however, that Plaintiff would make the mortgage payments each month, and when the loan was paid off, the house would be hers. [Pl.'s Dep. at 152; Behnamiri Dep. at 46–47]. The evidence shows that both Ms. Vickery and Plaintiff were aware prior to the closing that a quitclaim deed was not going to be part of the real estate transaction. [Vickery Dep. at 13–14, 22–23]. Instead, Mr. Behnamiri assured Ms. Vickery, the mortgage broker, that there was nothing to worry about; the house was going to be "Shalee's house," and she was going to make the payments; just for business reasons, he did not want her name on the loan. [*Id.* at 13].

In her deposition, Plaintiff testified that the fraudulent misrepresentation she contends Mr. Behnamiri made about the ownership of the house was that he made her believe she "was going to be able to move into this house with my children, it would be a safe haven and a safe place where I could dwell." [Pl.'s Dep. at 178]. She also

AO 72A
(Rev.8/8
2)

testified, however, that when the house closed, she knew that it was solely in Mr. Behnamiri's name, because "[w]e had a better deal in Mo's name." [*Id.*].  Plaintiff argues that after she resigned, and the home could no longer serve as leverage to hold over her, Mr. Behnamiri began the eviction process, despite the fact that "she had been behind on payments for around five years." [Doc. 154, Pl.'s Resp. Br., at 21].  Plaintiff argues that Mr. Behnamiri's conduct suggests that he intended from the very beginning to use the purchase of the house as leverage over Plaintiff in order to control her.  [*Id.*].

In his summary judgment brief, Mr. Behnamiri argues that Plaintiff's fraud claim fails because under Georgia law, actionable fraud cannot be based on statements and promises as to future events.  [Doc. 130-1 at 19, citing *Ely v. Stratoflex, Inc.*, 132 Ga. App. 569, 571, 208 S.E.2d 583, 584 (1974)].  Failure to perform a future promise does not constitute a false representation, unless when the promise was made, the promisor had no present intention of performance.  *See id.* ("Fraud cannot be predicated upon statements which are promissory in their nature as to future acts."). It is undisputed that at the time Mr. Behnamiri obtained a loan to purchase the house in Canton in 2007, both Plaintiff and Mr. Behnamiri understood that she was responsible for making monthly payments to Mr. Behnamiri in the amount of the mortgage payments on the loan in order to eventually own the house.  [Pl.'s Dep. at

151; Behnamiri Dep. at 47]. All parties agree that the house was not a gift from Mr. Behnamiri to Plaintiff, or otherwise free. [Pl.'s Dep. at 151; Behnamiri Dep. at 62]. Plaintiff understood that she would own the home after making monthly payments to Mr. Behnamiri over the loan's twenty or thirty year term. [Pl.'s Dep. at 152, 177 ("I never said . . . I was going to own the house before the note was paid.")]. Mr. Behnamiri testified that before he bought the house, they also discussed that she would pay the mortgage, and if she ever got a point where she could afford to purchase the house, he would sell it to her. [Behnamiri Dep. at 46–47]. While Plaintiff does not recall discussing the purchase option, she has not meaningfully disputed that her interest in the house was contingent upon her making monthly payments. Plaintiff's text messages to Mr. Behnamiri in response to his attempts to collect reflect her understanding that her possession of the house was contingent upon making monthly payments. On August 11, 2014, she thanked Mr. Behnamiri for "being so patient" with her. She wrote, "The last thing I want to do is lose my house or my job. Ypu [sic] have been beyond understanding and I couldn't be more appreciative." [Doc. 141-1 at 298].

The evidence reflects that at the time Mr. Behnamiri offered to help Plaintiff purchase a house, both Plaintiff and Mr. Behnamiri believed that she would make the

60

monthly payments to Mr. Behnamiri in the monthly amount owed on the loan. Mr. Behnamiri acknowledges that before the real estate closing, Ms. Vickery expressed concern to him that Plaintiff would have no rights to the house under their arrangement.  But he told Ms. Vickery, "[Y]ou don't have to worry about it because this will be her house.  She will make the payments on this house; this will be her house." [Vickery Dep. at 44–45].

Under Georgia law, representations to support a claim of fraud must relate to an existing fact or a past event, not a future event, unless it be an event which the party making the representation knows will never occur.  *Marler v. Dancing Water Lakes, Inc.*, 167 Ga. App. 99, 100, 305 S.E.2d 876, 877 (1983). "Mere broken promises, unfulfilled predictions, and erroneous conjectures do not meet this test." *Id.*  It is not fraud where the person relying on the alleged fraud as a basis of an action "had equal and ample opportunity to prevent the happening of the occurrence, and made it possible through a failure to exercise proper diligence." *Id.*  There is no justifiable reliance where, like here, the alleged representation consists of:

> expressions of . . . hope, expectation, and the like, and where it relates to matters which from their nature, situation, or time, can not be supposed to be within the knowledge or under the power of the party making the statement, the party to whom it is made is not justified in relying upon it. . . .  It is elementary that no one has a right to rely on a statement

61

> of another as to what could and would take place in the
> future. The activities of life are too uncertain for anyone to
> depend on such representations. And the law recognizes no
> actionable right in the event one does rely upon such
> uncertainties.

*Id.* Mr. Behnamiri's assurance that Plaintiff would make the payments and eventually own the house "is clearly a representation meant to take place in the future and did not misrepresent and had no relation to the misrepresentation of an existing fact or a past event,—an essential element of fraud." *See id.* at 878 (quoting *Cosby v. Asher*, 74 Ga. App. 884, 887, 41 S.E.2d 793 (1947)).  To the extent Mr. Behnamiri made a statement that he would convey the house to Plaintiff in the future, conditioned upon Plaintiff making payments towards the loan on the property, Plaintiff has submitted no probative evidence that such statement was untrue at the time it was made.  The arrangement with Mr. Behnamiri apparently worked well for more than seven years, until Plaintiff started having financial difficulties that caused her to begin missing payments on the property.  Even then, Mr. Behnamiri waited four more years before taking any action to sell the home.  Plaintiff has not established justifiable reliance, especially in light of the fact that she admits not having made any payments on the property for years, and that she continues to live there rent-free.

On the same note, Plaintiff has submitted no evidence to support any claim for

actual damages due to the alleged fraud. It is undisputed that to this day, Mr. Behnamiri continues to pay the mortgage for the home in which Plaintiff resides. She pays no taxes or insurance on the home, and has not made a payment to either Mr. Behnamiri or the mortgage company for the house since at least October 2018, and she was already behind in payments then.

For the reasons stated, Plaintiff has failed to establish all essential elements of her fraud claim. To the extent the district judge elects to exercise supplemental jurisdiction over Plaintiff's state law claims, I RECOMMEND that Mr. Behnamiri's motion for summary judgment be GRANTED on this claim. Otherwise, I RECOMMEND that Plaintiff's Count Five claim for fraud be DISMISSED WITHOUT PREJUDICE.

### 4. Equitable Estoppel, against Mr. Behnamiri

In Count Six of her Amended Complaint, Plaintiff again alleges that at the time of the real estate closing (in 2007), Mr. Behnamiri repeatedly told her and others that he intended for the property to belong to her, that she was entitled to use and possess the same, and that he would not take any action to interfere with her use and possession of the premises; yet in 2018, he took steps to have her evicted from the premises due to non-payment. [Am. Compl. ¶¶ 61–62]. Plaintiff alleges that she relied on

63

Mr. Behnamiri's misrepresentations by contributing to the downpayment on the property at the time of purchase, by making monthly payments for a number of years, and by contributing money to maintain, renovate, and repair the premises. [*Id.* ¶ 63]. Plaintiff asks this Court to impose a constructive trust under O.C.G.A. § 53-12-93,[11] and to reform the legal title to the property so that legal title is vested in her name. [*Id.* ¶¶ 64–65].

Georgia's constructive trust statute provides as follows:

> (a) A constructive trust is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity.

> (b) The person claiming the beneficial interest in the property may be found to have waived the right to a constructive trust by subsequent ratification or long acquiescence.

O.C.G.A. § 53-12-132.

Under Georgia law, the essential elements of equitable estoppel are: "(1) a false representation or concealment of facts; (2) within the knowledge of the party making the one or concealing the other; (3) the person affected thereby must be ignorant of the

---

[11] This code section was rescinded in 2010. The correct statute governing constructive trusts now appears to be O.C.G.A. § 53-12-132(a).

AO 72A
(Rev.8/8
2)

truth; (4) the person seeking to influence the conduct of the other must act intentionally for that purpose; and (5) the person complaining shall have been induced to act by reason of such conduct of the other. *Georgia Dermatologic Surgery Centers, P.C. v. Pharis*, 341 Ga. App. 305, 307, 800 S.E.2d 376, 378–79 (2017) (citing *Kim v. Park*, 277 Ga. App. 295, 296, 626 S.E.2d 232, 233 (2006)). "There can be no estoppel by conduct where both parties have equal knowledge or equal means of knowing the truth." *Id.* (citing *Collins v. Grafton, Inc.*, 263 Ga. 441, 443, 435 S.E.2d 37 (1993) (citation and punctuation omitted)).

Here, Plaintiff has failed to come forward with evidence to establish all elements of equitable estoppel. First, she has failed to show that Mr. Behnamiri made any false representation or concealment of any fact. The evidence shows that at the time of the closing, Plaintiff was fully aware that Mr. Behnamiri had decided to purchase the house with the title in his name only, as an investment property, by putting more money down, and getting approved for a loan with a better rate than Plaintiff, with no PMI. After discussing it, Plaintiff approved that decision because she thought it was a better deal than what she could do on her own, and it would save her "a lot of money." [Pl.'s Dep. at 148]. She was in no way "ignorant of the truth." Nor has Plaintiff submitted any evidence showing that Mr. Behnamiri in any way induced her

65

or tricked her into letting him buy the house instead of her buying the house on her own.  [*Id.*].

     She has also failed to establish that she is entitled to a constructive trust and to have legal title to the property vested in her name.  To support her claim, Plaintiff cites to a 1936 Supreme Court of Georgia case, *Chapman v. Faughnan*, 183 Ga. 114, 187 S.E. 634 (1936).  [Doc. 154 at 21].  In that case, the plaintiff claimed a one-fourth undivided interest in a parcel of land on which a house was located, and other part-interest owners were threatening to tear the house down.  The plaintiff claimed an interest because she with others had jointly owned real estate that was sold, and the proceeds were turned over to the defendant with the understanding and agreement that the defendant was to purchase the property in dispute on behalf of all the joint owners of the property that was sold, including the plaintiff.  Instead of purchasing the property in the name of all the joint owners, the defendant took title to the same solely in her name, and the deed was duly recorded.  *Id.* at 635.  The plaintiff asked the court for an injunction and for a decree vesting title in the plaintiff of her one-fourth interest in the property.  *Id.*  The court's opinion holds that, "Where land is purchased by one with the money of others, under an agreement and understanding that title is to be taken in the name of all, and the one procures a deed to the land but causes it to be

66

made to himself alone, an implied trust will arise in favor of the others as to an undivided interest in the land." *Id.*

This case is inapposite because there is no evidence that the parties in this case intended for title to be jointly held. Rather, it is undisputed that before the closing, Plaintiff was advised that title would be in Mr. Behnamiri's name only and that she would make monthly payments to him. Notwithstanding her present-day accusations, it is also undisputed that Plaintiff agreed to this arrangement.

For the reasons stated, Plaintiff has failed to establish a claim for equitable estoppel. To the extent the district judge elects to exercise supplemental jurisdiction over Plaintiff's state law claims, I RECOMMEND that Mr. Behnamiri's motion for summary judgment as to Plaintiff's Count Six equitable estoppel claim be GRANTED. Otherwise, I RECOMMEND that Plaintiff's Count Five claim of equitable estoppel be DISMISSED WITHOUT PREJUDICE.

### 5.    Punitive Damages

As to Plaintiff's Count Seven claim for punitive damages, Plaintiff's Amended Complaint requests an award of punitive damages against all defendants, including the Corporate Defendants. In Georgia, punitive damages "may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's

67

actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). Georgia courts have consistently recognized that a claim for punitive damages is effective only if there is a valid claim for actual damages to which it could attach, and that punitive damages may not be recovered if the party's substantive claims have failed. *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 284 Ga. App. 552, 561, 644 S.E.2d 440, 449 (2007); *Nelson & Hill, P.A. v. Wood*, 245 Ga. App. 60, 67, 537 S.E.2d 670, 677 (2000) (concluding that summary judgment on the punitive damages claim was appropriate because that claim was dependent upon the merits of the plaintiff's failed breach of fiduciary duty claim).

Because I have concluded that the Corporate Defendants and Mr. Negahdar are entitled to summary judgment on all of the substantive claims against them, no claim exists to which a punitive damages claim can attach. *Wood v. Archbold Med. Ctr., Inc.*, 738 F. Supp. 2d 1298, 1371 (M.D. Ga. 2010). Accordingly, to the extent the district judge elects to exercise supplemental jurisdiction over Plaintiff's state law claims, I RECOMMEND that the Corporate Defendants' and Mr. Negahdar's motions for summary judgment be GRANTED as to Plaintiff's claim for punitive damages. Because Plaintiff's battery claim against Mr. Behnamiri survives summary judgment,

68

Plaintiff's claim for punitive damages would also survive.

Should the district court decline to exercise supplemental jurisdiction, I RECOMMEND that Plaintiff's Count Seven claim for punitive damages against all defendants be DISMISSED WITHOUT PREJUDICE.

## C. **Plaintiff's Motion for Partial Summary Judgment and Mr. Behnamiri's Counterclaims**

As noted earlier, Plaintiff has filed a motion for partial summary judgment seeking judgment on her claim for retaliation against Defendant Behnamiri, as well as Mr. Behnamiri's counterclaims against Plaintiff for defamation, intentional infliction of emotional distress, and abusive litigation. [Doc. 127].

### 1.    **Plaintiff's Count Two Title VII Retaliation Claim**

Plaintiff argues that she is entitled to summary judgment on her Count Two Title VII retaliation claim because the counterclaims that Defendant Behnamiri filed in response to her complaint and amended complaint are baseless, lack factual support, and Mr. Behnamiri has admitted that he filed the counterclaims because she filed this lawsuit.

For the reasons discussed earlier in this Report and Recommendation, Plaintiff's retaliation claim against Mr. Behnamiri fails as a matter of law because there is no individual liability under Title VII. Accordingly, I RECOMMEND that Plaintiff's

69

motion for summary judgment on that claim be DENIED.

### 2.   Defendant Behnamiri's Counterclaims

Defendant Behnamiri has asserted three state-law counterclaims against Plaintiff: Defamation (Counterclaim I); Intentional Infliction of Emotional Distress (Counterclaim II); and Abusive Litigation (Counterclaim III).  [Doc. 51 at 18–20]. Plaintiff/Counterclaim-Defendant seeks summary judgment on each of these claims. [Doc. 127].

### a.   Defamation

In his defamation counterclaim, Mr. Behnamiri alleges that not more than one year prior to the date Plaintiff filed her original complaint in this case, Plaintiff published and/or stated defamatory and false statements of fact about him, including that he had committed, over the course of many years, sexual assault, battery, maintained a hostile work environment, and manipulated Plaintiff into accepting assistance in a home purchase solely for the purpose of creating control over Plaintiff for sexual purposes.  [Doc. 51 at 18].  He alleges that Plaintiff's statements and allegations are false and lack substantial justification, in that they are substantially frivolous, groundless, and vexatious.  [*Id.* at 19].  He further alleges that Plaintiff's statements and allegations are slanderous as a matter of law in that they were intended

AO 72A
(Rev.8/8
2)

to and did (1) cause injury to his reputation, (2) expose him to public hatred, contempt, ridicule, shame, or disgrace, and (3) affect him adversely in his trade or business.  [*Id.*]. He asserts that Plaintiff's allegations concerning criminal acts are per se defamatory, under O.C.G.A. § 51-5-4(a)(1).

Under Georgia law, slander or oral defamation is defined as "(1) Imputing to another a crime punishable by law; (2) Charging a person with . . . being guilty of some debasing act which may exclude him from society; (3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or (4) Uttering any disparaging words productive of special damage which flows naturally therefrom."  O.C.G.A. § 51-5-4(a).  Damage is inferred in the situations described in paragraphs (1) through (3), but for paragraph (4), special damage is essential to support an action.  *Id.* § 51-5-4(b).

To establish a viable claim sounding in defamation, Counterclaimant Behnamiri must plead and prove the following four elements:  (1) a false and defamatory statement concerning the counterclaimant; (2) an unprivileged communication to a third party; (3) fault by the counterdefendant (here Plaintiff Shalee Balius-Donovan) amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm.  *See StopLoss Specialists, LLC v.Vericlaim,*

71

*Inc.*, 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018) (citing *Smith v. DiFrancesco*, 341 Ga. App. 786, 787–88, 802 S.E.2d 69, 72 (2017); *Wertz v. Allen*, 313 Ga. App. 202, 205, 721 S.E.2d 122, 126 (2011)). "Although as a general rule the question whether a particular communication is defamatory is for the jury, if the statement is not ambiguous and reasonably can have only one interpretation, the question of defamation is one of law for the court." *Id.* (citing *Speedway Grading Corp. v. Gardner*, 206 Ga. App. 439, 441, 425 S.E.2d 676, 678 (1992)).

In order to satisfy the first element, the alleged defamatory statement must be shown to be false, and, as such, "a defamation action will lie only for a statement of fact" since "an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false." *StopLoss Specialists*, 340 F. Supp. 3d at 1346 (citations omitted). "[A]s a general rule, statements of pure opinion are not capable of being proven false and cannot form the basis of a defamation claim." *See Bryant v. Cox Enterprises, Inc.*, 311 Ga. App. 230, 234, 715 S.E.2d 458, 463 (2011).

Plaintiff argues that with regard to Mr. Behnamiri's defamation counterclaim, he has failed to identify any specific communication that Plaintiff allegedly made or published except for one text message between Plaintiff and himself dated December 4, 2018 that Mr. Behnamiri conceded in his deposition no one other than himself and

72

his attorneys saw.  [*See* Doc. 127-1, Pl.'s Br., citing Behnamiri Dep. at 89–91].

Mr. Behnamiri testified in his deposition that Plaintiff claimed in that text that he

bought the house so he could come there and have an affair with her, when in fact he

has never been to that house since he bought it.  [Behnamiri Dep. at 89–90].  When

asked directly, however, if anyone has seen that text message besides Mr. Behnamiri

or his attorneys, Mr. Benhamiri responded, "I don't think so." [Behnamiri Dep. at 90].

When Mr. Behnamiri was asked in his deposition what other statements he

contended Plaintiff made that constituted defamation, Mr. Behnamiri testified that the

employees at The Place and others found out about Plaintiff's claims from Plaintiff

speaking with them, and also from his attorney interviewing them about Plaintiff's

allegations.  [Behnamiri Dep. at 91].  Mr. Behnamiri testified that he assumed Plaintiff

had contacted one of his customers in order to obtain a written statement from her, but

he could not identify the customer except for her first name, "Pamela," and he had no

personal knowledge of what Plaintiff actually said or what Plaintiff may have

discussed with "Pamela."  [*Id.* at 93–94].

Plaintiff argues that the only other facts Mr. Behnamiri has offered in support

of his defamation claim concern the efforts he has been required to engage in as part

of the litigation process itself.  Mr. Behnamiri responded, as follows, in his deposition:

73

Q.      What other statements has she made that you base your [defamation] claim on?

A.      The nature of this whole shenanigan that we're in, the lawsuit. That is by itself a statement.

. . .

Q.      So your defamation claim is partly based on filing this litigation by the plaintiff?

A.      Correct.

Q.      When you say this whole shenanigan, you mean the litigation; right?

A.      The whole process of going through this, yes, sir–litigation, paperwork, everything.

[Behnamiri Dep. at 90–91].

In his response brief opposing Plaintiff's motion for summary judgment, Mr. Behnamiri points to Plaintiff's having contacted various employees and customers of The Place before she filed her charge with the EEOC, and communicating her claims of sexual harassment and other defamatory allegations to them.  [Doc. 147 at 5].  He asserts that under Georgia law, speaking constitutes publication sufficient to

74

support a cause of action for defamation.  [*Id.*, citing *Torrance v. Morris Publ'g Group, LLC,* 281 Ga. App. 563, 567, 636 S.E.2d 740 (2006)].

In his counterclaim for defamation, Mr. Behnamiri has generally asserted that Plaintiff defamed him by imputing a crime to him, by charging him with debasing acts, by making charges against him in reference to a business that he owns, and by uttering disparaging words against him that have impacted him personally, and impacted his business and his reputation.  However, apart from general assumptions, conclusory assertions, and inadmissible hearsay, Mr. Behnamiri has failed to identify any specific statement that Plaintiff made to anyone that constitutes defamation under Georgia law. Thus, with regard to defamatory statements that Plaintiff allegedly made before filing her lawsuit, Mr. Behnamiri has failed to establish a viable claim for defamation under Georgia law.

With regard to Plaintiff's allegations in her complaint and Amended Complaint, the immunity of parties and witnesses from liability for their conduct in judicial proceedings was established in England centuries ago.  *See Briscoe v. LaHue*, 460 U.S. 325, 330–31 (1983) (citing *Cutler v. Dixon*, 76 Eng. Rep. 886 (K.B. 1585); *Anfield v. Feverhill*, 80 Eng. Rep. 1113 (K.B. 1614); *Henderson v. Broomhead*, 157 Eng. Rep. 964, 968 (Ex. 1859); *see Dawkins v. Lord Rokeby*, 176 Eng. Rep. 800, 812 (C.P.

75

1866)).

This litigation privilege has been adopted in Georgia. *See* O.C.G.A. § 1-1-10(c)(1) (adopting English common laws as of May 14, 1776).  There is well settled Georgia law establishing that such defamation or libel claims are barred because the pleadings filed in a lawsuit, including the exhibits, are privileged as a matter of law. *See Finnerty v. State Bank and Trust Co.*, 301 Ga. App. 569, 569, 687 S.E.2d 842, 843 (2009) (citing O.C.G.A. § 51-5-8).  And the privilege is absolute, entirely freeing the party from any liability to the person injured by the words or the publication.  *Id*.

Georgia Code Section 51-5-8 provides as follows:

> All charges, allegations, and averments contained in regular pleadings filed in a court of competent jurisdiction, which are pertinent and material to the relief sought, whether legally sufficient to obtain it or not, are privileged. However false and malicious such charges, allegations, and averments may be, they shall not be deemed libelous.

*Id.*

For the reasons stated, to the extent the district judge elects to exercise supplemental jurisdiction over the state law claims, Counterclaimant Behnamiri has not established a viable claim for defamation under Georgia law.  Accordingly, I RECOMMEND that Plaintiff's motion for summary judgment as to that claim be GRANTED.  Otherwise, I RECOMMEND that this counterclaim be DISMISSED

76

WITHOUT PREJUDICE.

> **b.**    **Intentional Infliction of Emotional Distress**

For the same or similar reasons, summary judgment should also be granted  on Mr. Behnamiri's counterclaim for intentional infliction of emotional distress.

Under Georgia law, a plaintiff (or here, a counterclaimant) must show (1) intentional or reckless conduct; (2) extreme and outrageous conduct; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional injury.  *See Jarrard v. United Parcel Serv., Inc.*, 242 Ga. App. 58, 59, 529 S.E.2d 144, 146 (2000); *Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 229, 335 S.E.2d 445, 447 (1985).

The required standard for intentional infliction of emotional distress is stringent and difficult to establish.  *Bridges*, 176 Ga. App. at 229, 335 S.E.2d at 447; *see also Moses v. Prudential Ins. Co. of Am.*, 187 Ga. App. 222, 224, 369 S.E.2d 541, 543 (1988) (intentional infliction of emotional distress is hard to establish because of "the court's justifiable concern that causes of action grounded upon emotional distress may give rise to fictitious, inflated, or trivial claims unless properly circumscribed").  This tort is reserved for only the most egregious behavior, which plaintiffs "bear a heavy burden" in establishing.  *Mears v. Gulfstream Aerospace Corp.*, 225 Ga. App. 636,

77

640, 484 S.E.2d 659, 664 (1997).  Whether this burden has been met is a question of law for the court to decide.  *Id.*

Conduct is "extreme and outrageous" only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yarborough v. SAS Sys., Inc.*, 204 Ga. App. 428, 429, 419 S.E.2d 507, 509 (1992). Mere insults, indignities, threats, annoyances, petty oppressions, or the fact the plaintiff was offended or insulted will not support an allegation of extreme and outrageous conduct.  *Perkins-Carrillo v. Systemax, Inc.*, No. 1:03-cv-2836-TWT, 2006 WL 1553957, at *18 (N.D. Ga. May 26, 2006).  "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Bridges*, 176 Ga. App. at 230, 335 S.E.2d at 448.  Even termination of employment or threats of termination are insufficient to establish a claim for intentional infliction of emotional distress. *See Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. 240, 243, 503 S.E.2d 877, 880 (1998).

Counterclaimant Behnamiri asserts that Plaintiff's allegations and lawsuit have caused him "a lot of distress," that the "idea of this lawsuit and everything by itself is disturbing," and it has caused him not to be as effective as he used to be in his business

AO 72A
(Rev.8/8
2)

because he is always thinking about it. [Behnamiri Dep. at 94–96]. He testified that Plaintiff's lawsuit has also caused him humiliation and embarrassment, and distracted him from his daily work; however, he has not sought any medical treatment or psychological counseling of any sort, nor has he been prescribed any medication to help him deal with his emotional distress. [*Id.* at 96–98]. Mr. Behnamiri testified that he controls the stress he suffers as a result of this litigation by playing golf. [*Id.* at 98].

Mr. Behnamiri has failed to meet his stringent burden for establishing a claim of intentional infliction of emotional distress. Under Georgia law, the mere filing of a lawsuit is not the type of humiliation, insulting, or terrifying conduct which will give rise to a claim for intentional infliction of emotional distress. *See Westinghouse Credit Corp. v. Hall*, 144 B.R. 568, 577 (S.D. Ga. 1992) (citing *Savell, Williams v. Coddington*, 176 Ga. App. 179, 179, 335 S.E.2d 436 (1985); *Rolleston v. Huie*, 198 Ga. App. 49, 400 S.E.2d 349 (1990); *Georgia Power Co. v. Johnson*, 155 Ga. App. 862, 274 S.E.2d 17 (1980) (preparation and filing of legal pleadings could not reasonably be characterized as humiliating, insulting or terrifying)); *see also State Soil & Water Conservation Comm'n v. Stricklett*, 252 Ga. App. 430, 437, 555 S.E.2d 800, 806 (2001) (holding that a claim for intentional infliction of emotional distress based solely on filing frivolous pleadings fails). While Plaintiff's conduct and litigation may

79

be extremely offensive to Mr. Behnamiri, he has failed to come forward with evidence of any extreme and outrageous conduct or a causal link between the alleged conduct and severe emotional distress.  Accordingly, his counterclaim for intentional infliction of emotional distress fails as a matter of law, and Plaintiff is entitled to summary judgment on this counterclaim.

Thus, to the extent the district judge elects to exercise supplemental jurisdiction over this claim, I RECOMMEND that Plaintiff's motion for summary judgment be GRANTED.  Otherwise, I RECOMMEND that Mr. Behnamiri's counterclaim for intentional infliction of emotional distress be DISMISSED WITHOUT PREJUDICE.

### c.    Abusive Litigation

Mr. Behnamiri's third and final counterclaim alleges that Plaintiff has engaged in abusive litigation by intentionally and deliberately, in a calculated manner, asserting claims against him that have no basis in fact and are contrived to further her true motive in this case, that of procuring a residence that belongs to him and to which she has no legal claim or ownership interest.  [Doc. 51 at 20].

Under Georgia law, "abusive litigation" is defined as, "Any person who takes an active part in the initiation, continuation, or procurement of civil proceedings against another shall be liable for abusive litigation if such person acts: (1) with

80

malice; and (2) without substantial justification."  O.C.G.A. § 51-7-81.

"Malice" is defined in O.C.G.A. § 51-7-80(5) as "acting with ill will or for a wrongful purpose and may be inferred in an action if the party initiated, continued, or procured civil proceedings or process in a harassing manner or used process for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based."

"Without substantial justification," when used with reference to any civil proceeding, claim, defense, motion, appeal, or other position, as defined in O.C.G.A. § 51-7-80(7), "means that such civil proceeding, claim defense, motion, appeal, or other position is: (A) Frivolous; (B) Groundless in fact or law; or (C) Vexatious." *Id.*

"Wrongful purpose" is defined as "(A) Attempting to unjustifiably harass or intimidate another party or witness to the proceeding; or (B) Attempting to unjustifiably accomplish some ulterior or collateral purpose other than resolving the subject controversy on its merits."  O.C.G.A. § 51-7-80(8).

The malice alleged here focuses on Plaintiff's actions in bringing this lawsuit as being for a wrongful purpose.  Mr. Behnamiri contends that Plaintiff has asserted her Title VII claims against him in an attempt to unjustifiably accomplish her ulterior or collateral purpose of obtaining title to the house rather than resolving the subject

AO 72A
(Rev.8/8
2)

controversy on its merits, in violation of Georgia's abusive litigation statute, O.C.G.A. § 51-7-80(8).

In response, Plaintiff asserts that she filed her lawsuit in good faith, asserted that good faith as an affirmative defense in her answer to Mr. Behnamiri's counterclaim, and has produced evidence in support of each of her allegations. [Doc. 127-1 at 6; Doc. 52 at 2].

Although the allegations in Mr. Behnamiri's counterclaim could state a prima facie case for abusive litigation, the claim fails as a matter of law because Mr. Behnamiri failed to provide the required legal notice. *See In re McTyeire*, 357 B.R. 898, 905 (M.D. Ga. 2006).  Under O.C.G.A. § 51-7-84, the party asserting abusive litigation must give the opposing party written notice of the claim "[as] a condition precedent" to the claim and an opportunity to withdraw the abusive suit. Although it seems intuitive that the counterclaim itself would be sufficient to provide the required notice, the Georgia Court of Appeals has held that a counterclaim for abusive litigation cannot be used to give notice of such suit. *In re McTyeire*, 357 B.R. at 905 (citing *Langley v. National Labor Group, Inc.*, 262 Ga. App. 749, 586 S.E.2d 418, 422 (2003)).

In this case, Mr. Behnamiri's counterclaim for abusive litigation does not allege

AO 72A
(Rev.8/8
2)

that he provided the necessary notice, nor has he offered any evidence of notice. Secondly, before filing a claim for abusive litigation, the statute requires a final termination in the defendant's favor of the action allegedly constituting abusive litigation. *See* O.C.G.A. § 51-7-84(b). Accordingly, Mr. Behnamiri's counterclaim for abusive litigation also is premature. Where, as here, the notice and final termination requirements of the statute are not met, Georgia courts have held that claims for abusive litigation under O.C.G.A. § 51-7-80, et seq., are properly disposed of by summary judgment. *Langley*, 586 S.E.2d at 422–23.

In sum, there is no evidence that statutory notice was sent, and Plaintiff's action in which she supposedly initiated abusive litigation remains pending. Accordingly, to the extent the district judge elects to exercise supplemental jurisdiction over the state law claims, I RECOMMEND that Plaintiff's motion for summary judgment as to Mr. Behnamiri's counterclaim for abusive litigation be GRANTED. Otherwise, I RECOMMEND that Mr. Behnamiri's counterclaim for abusive litigation be DISMISSED WITHOUT PREJUDICE.

## V.   <u>CONCLUSION</u>

For the reasons discussed above, I **RECOMMEND** the following:

(1)   that the defendants' various motions for summary judgment

AO 72A
(Rev.8/8
2)

[Docs. 130, 140, 143] be **GRANTED IN PART**; specifically, that defendants should be granted summary judgment on the Title VII claims asserted in Counts One and Two of Plaintiff's Amended Complaint;

(2)   that Plaintiff's Motion for Partial Summary Judgment [Doc. 127] be **DENIED IN PART**, in that her claims in Counts One and Two fail as a matter of law; and

(3)   that the district judge decline to exercise supplemental jurisdiction and **DISMISS** all the remaining state law claims against the defendants and counterclaims **WITHOUT PREJUDICE**.

**IT IS SO RECOMMENDED**, this 14th day of July, 2021.

**CATHERINE M. SALINAS**
**UNITED STATES MAGISTRATE JUDGE**